Daniel S. Alter
Attorney for the Debtor
360 Westchester Avenue  #316
Port Chester, New York 10573
(914) 393-2388

**Hearing Date: January 21, 2021**
**Hearing Time: 10:00 a.m. ET**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

Z & J, LLC d/b/a/ APPEAL TECH,

                         Debtor.

------------------------------------------------------------x

Chapter 11
Case No.19-11502(JLG)

## NOTICE OF HEARING ON DEBTOR'S MOTION PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER (i) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND <u>INTERESTS AND (ii) GRANTING RELATING RELIEF</u>

**PLEASE TAKE NOTICE** that upon the application of Z& J, LLC d/b/a Appeal Tech (the "Debtor"), the above-captioned Debtor, by its attorney, Daniel S. Alter, the undersigned will move this Court, before the Honorable James L. Garrity. Jr., United States Bankruptcy Judge at the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004 in Courtroom <u>601</u>, on the *21st day of January, 2021 at 10:00 a.m.* (the "Hearing Date"), or as soon thereafter as counsel may be heard, for an Order pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (i) Authorizing and Approving Contract of Sale of Substantially all of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances and Interests and (ii) Granting Good Faith Purchaser Status to

Purchaser, together with such other and further relief as is just, proper and equitable under the circumstances.

**PLEASE TAKE FURTHER NOTICE,** that objections, if any, to the relief requested in the Application must be made in writing, filed electronically with the United States Bankruptcy Court for the Southern District of New York at the Bankruptcy Court's web address www.nysb.uscourts.gov, with a copy delivered directly to the Chambers of Honorable James L. Garrity, and served upon (i) Daniel S. Alter, 360 Westchester Avenue #316, Port Chester, New York 10573 and (ii) The Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014, Attn: Andy Velez-Rivera, Esq., so as to be received at least three (3) business days prior to the Hearing Date.

Dated:  Port Chester, New York
          December 21, 2020

Daniel S. Alter
Attorney for the Debtor
By: */s/ Daniel S. Alter*
360 Westchester Avenue   #316
Port Chester, New York 10573
(914) 393-2388

Daniel S. Alter
Attorney for the Debtor
360 Westchester Avenue #316
Port Chester, New York 10573
(914) 393-2388

**Hearing Date: January 21, 2021**
**Hearing Time: 10:00 a.m.** ET

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

Z & J, LLC d/b/a/ APPEAL TECH,

                            Debtor.

------------------------------------------------------------x

                           Chapter 11
               Case No.19-11502(JLG)

## DEBTOR'S MOTION PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER (i) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, <u>ENCUMBRANCES AND INTERESTS AND (ii) GRANTING RELATED RELIEF</u>

**TO:**   **THE HONORABLE JAMES L. GARRITY, JR.,**
      **UNITED STATES BANKRUPTCY JUDGE:**

       Z & J, LLC d/b/a Appeal Tech, the above-captioned debtor and debtor-in-possession ("<u>Debtor</u>", "<u>Seller</u>" or "<u>Appeal Tech</u>"), by its attorney, Daniel S. Alter, as and for its motion ("Motion") pursuant to Sections 363(b), (f) and (m) of Title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") 2002, 6004, and the Sale Guidelines for the Conduct of Asset Sales, General Order M-383 (the "<u>Sale Guidelines</u>") for an Order substantially in the form annexed hereto as <u>Exhibit "A"</u> (the "<u>Proposed Order</u>") authorizing and approving the sale of substantially all of the Debtor's assets, pursuant to a contract of sale entered into with Counsel Press, Inc. ("Buyer" or "Counsel Press") and under the Debtor's proposed Plan (as defined herein), to be conveyed free and clear of all liens, claims, encumbrances and interests, with any such liens, claims, encumbrances and interests

attaching to the Cash Proceeds (as defined herein) of sale, together with other related relief, respectfully represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" for the Southern District of New York, dated July 10, 1984 (Ward, C.J.).  Venue of these proceedings and this Application is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).

## BACKGROUND

2.      On May 9, 2019 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the "Case").  The Debtor has continued in possession of its property and the management of its affairs as debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

3.      The Debtor is a "small business debtor" as defined in section 101(51D) of the Bankruptcy Code, and this is a "small business case" as defined in section 101(51C) of the Bankruptcy Code.

4.      No official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee").  No trustee or examiner has been appointed in the Case.

2

5.      On July 11, 2019, the Court entered an order establishing August 28, 2019 as the deadline for creditors to file proofs of claim against the Debtor, and November 8, 2019 as the bar date for governmental units.

6.      The Debtor is in the business of assisting attorneys in the preparation of appellate cases and performs the procedural work that is required in appellate matters. The Debtor's primary business location is at 7 West 36th Street, New York New York (the "Premises").

7.      As of the Petition Date, Debtor's assets consisted of the following: (a) Cash in the bank in the amount of $82,500.00; (b) Security Deposit with the landlord for the Debtor's New York City office space in the amount of $71,190.47; (c) Accounts receivable in the amount of $1,365,000.00; (d) Office Equipment and Fixtures, together with cutting and binding machinery in the amount of approximately $25,000; and (e) Commercial Lease for the Premises with Quartz Associates, LLC.

8.      As of the Petition Date, as evidenced by proofs of claims filed in this matter, Debtor has a total of $1,683,221.50 of secured claims owed to the following secured creditors in the following priority: (a) First Priority Secured Claim to JP Morgan Chase Bank, N.A. in the amount of $897,783.65 evidenced by, *inter alia*, a UCC-1 Financing Statement, which was renewed on August 27, 2015 and (b) Second Priority Secured Claim to New York State Department of Tax and Finance in the total amount of $785,437.85 per New York State Tax Warrants entered in 2017 and 2018.

9.      Counsel Press, Inc. ("Counsel Press") is in the business of assisting attorneys in all 50 states with expert assistance in preparing, filing and serving appeals in any state or federal appellate court nationwide and several international tribunals.

3

10.     Prior to the Petition Date, the Debtor, the Debtor's principal Michael Kestan, Counsel Press and certain of its affiliates, and individuals Laurence Mynes and Jonathan Wallach were parties to a state court litigation in the matter titled *Z&J, LLC d/b/a Appeal Tech v. Laurence Mynes, Counsel Press, Inc., et. al.,* Supreme Court of New York, County of New York, Index No. 650620/2018 (the "State Court Action"). The State Court Action was removed to the United States District Court for the Southern District of New York and transferred to the Court in November 2019, where the matter was assigned Adversary Proceeding No. 19-10435 (JLG) (the "Adversary Proceeding") and remains pending.

## THE ASSET PURCHASE AGREEMENT

11.     During the pendency of the Case and the Adversary Proceeding, the Debtor and Counsel Press discussed the possibility of a sale of the Debtor's assets to Counsel Press in conjunction with a global settlement of the Adversary Proceeding, and thereafter negotiated the terms and conditions of a sale of substantially all of the Debtor's assets. The negotiations and efforts employed by the Debtor to sell its assets were successful and resulted in the Asset Purchase Agreement, dated as of December 21, 2020 (the "Sale Agreement"), between Debtor as Seller and Counsel Press as Buyer for the sale and purchase of substantially all of the Debtor's assets, free and clear of all liens, claims, encumbrances and interests (the "Sale"). A copy of the Sale Agreement is annexed hereto as Exhibit "B".

12.     Pursuant to the Motion and under the Debtor's proposed chapter 11 Plan filed contemporaneously herewith (the "Plan"), substantially all of the assets of the Debtor will be sold to Counsel Press in accordance with the terms and conditions of the

4

Sale Agreement. Counsel Press has agreed to pay a purchase price of between $5,000,000.00 and $5,500,000.00 (with the final amount to be determined pursuant to certain potential adjustments, as set forth in the Sale Agreement) (the "Purchase Price"). Additionally, the sale would be closed contemporaneously with all parties to the Adversary Proceeding discontinuing their causes of action against one another pursuant to the motion for approval of the Stipulation and Order filed in the Adversary Proceeding at or about the time of the filing of this Motion, as well as Court approval of the Debtor's Disclosure Statement. It is anticipated that the Debtor will receive confirmation of its Chapter 11 Plan on or about March 2, 2021, in conjunction with the Sale.

13.    The Purchase Price includes the amount of $4,000,000.00 to be paid in cash upon closing (the "Cash Proceeds"), with an additional $1,000,000 to be paid by delivery at closing of a $1,000,000 non-interest bearing unsecured subordinated seller note payable in two installments of $500,000 each on the first and second anniversary of the closing, subject to certain potential adjustments as set forth in the Sale Agreement and as summarized below. It is anticipated that the Cash Proceeds of the Sale paid at closing will be sufficient to (i) pay in full all allowed administrative, priority and other unclassified claims, all allowed secured, priority, and general unsecured claims; all United States Trustee Quarterly Fees at or about the time of closing; (ii) establish a reserve for the full amount of all disputed claims pending disposition of such disputed claims, and (iii) allow for a distribution of the remaining sale proceeds to the Debtor's sole shareholder, Michael Kestan.

14.    Additionally, the sale would be closed contemporaneously with (i) all

5

parties to the Adversary Proceeding releasing all claims against one another and discontinuing their causes of action against one another with prejudice, and (ii) approval of the Debtor's Disclosure Statement.  Simultaneously with the filing of this Motion, the Debtor has filed (i) in the Adversary Proceeding a motion pursuant to Bankruptcy Rule 9019 for approval of a stipulation and order resolving all claims and counterclaims asserted by all parties to the Adversary Proceeding, and (ii) a motion seeking approval of its Disclosure Statement. It is anticipated that the Debtor will receive confirmation of its Chapter 11 Plan on or about March 2, 2021, in conjunction with the Sale.

15.    The following are some of the key provisions of the Sale Agreement:1

(a)    Seller agrees to sell and the Buyer agrees to purchase substantially all of the Debtor's assets (the "Purchased Assets"), free and clear of all liens, claims, encumbrances and interests pursuant to the Sale Agreement, for a Purchase Price consisting of: (i) a minimum of $4,000,000 in cash at closing; (ii) a $1,000,000 non-interest bearing unsecured subordinated seller note payable in two annual installments of $500,000 each on the first two anniversaries of the closing, which the Debtor shall direct to be made payable to Debtor's sole shareholder, Kestan, and (iii) an amount not to exceed $500,000 consisting of the Debtor's cash balance at closing and any of the Debtor's receivables at closing, minus commissions, that are collected in the 12 month period following the closing.

(b)    The Debtor shall pay all third party debt, including all short term and long term indebtedness, tax liens, all letters of credit, capital leases, mortgage debt or

---

1 The description of certain of the terms and provisions set forth in this Motion is intended to be a summary only, and the reader is referred to the Sale Agreement and the exhibits, appendices and

debt guarantees, preferred stock and other non-business obligations of the Debtor as of the Closing date.  The Buyer will not assume any of the Debtor's liabilities, nor will it assume any real estate or equipment leases or liabilities, or any employee compensation, commissions, severance or similar obligations.

(c)    On or prior to the closing date, all parties to the Adversary Proceeding shall execute releases of all claims against one another and cause the dismissal with prejudice of all claims and counterclaims against one another in the Adversary Proceeding and the State Court Action.

(d)    The Debtor's President and sole shareholder, Michael Kestan, and any other member(s) receiving consideration from the sale of the Debtor's assets will agree not to compete with the Buyer for five years from the closing date and to maintain customary confidentiality and non-disparagement covenants.

## EXTRAORDINARY PROVISIONS UNDER SALE GUIDELINES

16.    The Purchase Agreement and this Motion contain the following "extraordinary provisions" set forth in Section I.D. of the Sale Guidelines:

(a)    <u>Private Sale/No Competitive Bidding</u>.  The Buyer has stated that it is not willing to proceed with the transaction if the sale of the Purchased Assets is subject to competing bids, and the Sale Agreement incorporates the parties' agreement that the Debtor seek approval of the transactions contemplated in the Sale Agreement without requesting an auction.  Under the facts and circumstances of this case, including that the Cash Proceeds of the sale are anticipated

---

schedules thereto for a complete recitation of the sale transaction.  In the event of any inconsistency

to be sufficient to pay all allowed claims and obligations of the Debtor
in full, the Debtor submits that a private sale to the Buyer pursuant to
the terms of the Sale Agreement is appropriate.

(b)   Use of Proceeds.  The Debtor seeks authorization to pay
undisputed claims of secured creditors at closing, with the balance of
the Cash Proceeds to be deposited into the distribution fund
established under the Debtor's plan and held in escrow by the Debtor's
disbursing agent pending distribution under the Plan.

(c)   Requested Findings as to Successor Liability.  The proposed Sale
Order contains findings of fact and conclusions of law limiting the
Buyer's successor liability.  These provisions were requested by the
Buyer as set forth in the Purchase Agreement.

(d)   Relief from Bankruptcy Rule 6004(b).  The Debtor seeks relief from
the 14-day stay imposed by Bankruptcy Rule 6004(b) in order to
promptly consummate the sale transactions as set forth in the Sale
Agreement, as requested by the Buyer.

**THE SALE IS IN THE BEST INTERESTS OF DEBTOR'S ESTATE**

17.   The Debtor has operated profitably during the pendency of this Case.
Notwithstanding, and based upon the Debtor's assets and liabilities, as set forth above,
it would be very difficult for the Debtor to confirm a "bootstrapping" Chapter 11 Plan of
Reorganization, unless it were to also receive a favorable outcome in the Adversary
Proceeding and, in turn, fund a Plan with funds from continued operations, as well as

---

between the Sale Agreement and this Motion, the Sale Agreement shall control.

with funds received from the Adversary Proceeding.

18.     The Debtor's business is highly specialized and requires highly specific

knowledge, obtainable only through many years of experience working within the state

and federal appellate court systems in New York.  As a result, the Debtor believes that

there would not be any potential purchasers of the Debtor's assets, other than its main

competitor in the space, Counsel Press, and that any attempts to market the Debtor's

assets to any other potential purchasers would be futile and result in a waste of estate

assets.  Therefore, the Debtor has not attempted to market or sell its assets to any

other purchasers.   Moreover, as explained above, the cash portion of the purchase

price to be paid by Counsel Press at closing will enable the Debtor to pay all allowed

claims and obligations in full, at or about the time of closing, with a surplus distribution

to the Debtor's sole shareholder, Michael Kestan.  Any increase in the purchase price

above the Purchase Price under the Sale Agreement would inure solely to the benefit of

Mr. Kestan and would not have any other effect on the Debtor's estate. After extensive

negotiations with Counsel Press, the Debtor believes that the Purchase Price is the

highest and best offer that the Debtor will receive for its assets.  Additionally, the

transaction will resolve all claims and issues relating to the Adversary Proceeding.

Therefore, the Debtor submits that the proposed private sale to Counsel Press should

be approved by the Court and should not be subject to any auction or any higher or

better offers.

19.     The Debtor, therefore, seeks the approval of the sale of substantially all of

its assets to Counsel Press, free and clear of all liens, claims, encumbrances and

interests pursuant to the terms and conditions of the Sale Agreement and under its

9

proposed Plan filed contemporaneously herewith.   As further described in the

Disclosure Statement and Plan, the Cash Proceeds will be deposited into and held in

escrow by the Debtor's Disbursing Agent and shall be only distributed in accordance

with the Plan and any further orders of the Bankruptcy Court.

### RELIEF REQUESTED

20.     Debtor submits this Application for authority to sell the Debtor's

Purchased Assets pursuant to the terms and provisions of the Sale Agreement

Sections 363(b) and (f) of the Bankruptcy Code and Bankruptcy Rule 6004, free and

clear of all liens, claims and encumbrances, with any such liens, claims, encumbrances

and interests attaching to the Cash Proceeds of sale.

21.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, as

follows:

> "The trustee, after notice and a hearing, may use, sell or lease,
> other than in the ordinary course of business, property of the estate…"

22.     Bankruptcy Rule 6004 specifically addresses the procedures required for

a private sale, as contemplated herein and provides as follows:

> (f) Conduct of sale not in the ordinary course of business
> (1) Public or private sale
> All sales not in the ordinary course of business
> may be by private sale or by public auction.

23.     "When a debtor desires to sell an asset, its main responsibility, and the

primary concern of the bankruptcy court, is the maximization of the value of the asset

sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd.*

147 B.R. 650 (S.D.N.Y. 1992).

24.     Ample authority exists for approval of the sale of the Purchased Assets

10

pursuant to the Sale Agreement. Pursuant to section 363(b)(1) of the Bankruptcy Code,
the debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than
in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).
"Although not specified by section 363, the Second Circuit requires that transactions
under section 363 be based on the sound business judgment of the debtor or trustee."
*In re MF Global, Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citing *Comm. of Equity
Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).
"Generally, where the debtor articulates a reasonable basis for its business decisions
(as distinct from a decision made arbitrarily or capriciously), courts will generally not
entertain objections to the debtor's conduct." *MF Global*, 467 B.R. at 730 (citing *In re
Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)). "If a valid business
justification exists, then a strong presumption follows that the agreement at issue was
negotiated in good faith and is in the best interests of the estate; the burden of rebutting
that presumption falls to parties opposing the transaction." *MF Global*, 467 B.R. at 730.
"Once a court determines that a sound business justification exists, the court must
determine whether (i) the debtor has provided all interested parties with adequate and
reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is
proceeding in good faith." Id. at 730.

25.    The Debtor believes that the Purchase Price for the sale of the Purchased
Assets is the highest and best price and that the best interests of the estate and its
creditors shall be well served with the proposed sale as it will result in the resolution of
all of Debtor's claims and obligations under the proposed Plan.

26.    The Buyer is represented by separate counsel and has been since the

11

outset of its negotiations with the Debtor and has no connection or relationship with the Debtor or its attorneys.

27.      In light of the foregoing, the Debtor submits that the private sale of the Debtor's assets is reasonable and a sale at auction is not warranted as it will not yield any greater purchase price or any greater recovery to the creditors of the Debtor's estate.

28.      Based upon the foregoing, it is respectfully submitted that sound business reasons exist for a sale of the Purchased Assets on the terms and conditions set forth in the Sale Agreement.

**SALE FREE AND CLEAR OF ALL
<u>LIENS, CLAIMS AND ENCUMBRANCES</u>**

29.      Section 363(f) of the Bankruptcy Code provides that a debtor in possession may sell property free and clear of liens, claims and encumbrances with any such encumbrances attaching to the net proceeds of the sale, if one of the following conditions is satisfied:

(1)      applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)      the lien holder or claimholder consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater thanthe aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      the lien holder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

<u>See</u> 11 U.S.C. §363(f).

12

30.     As set forth in Paragraph 6 above, the Property is encumbered by
secured claims asserted in the total amount of $1,683,221.50, consisting of the claims
of JP Morgan Chase Bank, N.A. in the amount of $897,783.65 and the New York State
Department of Tax and Finance in the total amount of $785,437.85.

31.     As explained above, the Cash Proceeds of the Sale are sufficient to
satisfy all of the liens on the Debtor's assets (as well as all other claims against the
Debtor's estate, in full).  It is therefore respectfully submitted that the elements of
Section 363(f) of the Bankruptcy Code are satisfied, and that the sale of the assets
should be approved, free and clear of all liens, claims, encumbrances and interests,
with any such liens, claims, encumbrances and interests attaching to the Cash
Proceeds of sale.

## GOOD FAITH PURCHASER STATUS

32.     Section 363(m) of the Bankruptcy Code provides as follows:

> (m) The reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease of
> property does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

33.     The Debtor respectfully requests that the Court enter an order granting
the proposed purchaser, Counsel Press, Inc., "good faith purchaser" status pursuant to
Section 363(m) of the Bankruptcy Code.  The Buyer is a good faith purchaser under
section 363(m) of the Bankruptcy Code.  Buyer has negotiated, by and through its
respective counsel, and entered into the Agreement in good faith and at arms' length
with the Debtor. The proposed purchaser is a third party unrelated to the Debtor or its

13

principal. The Buyer is not an "insider" of the Debtor within the meaning of Section 101(31) of the Bankruptcy Code, and is not controlled by, or acting on behalf of, and insider of the Debtor or the Debtor itself.

34.     As such, the Debtor submits that the Buyer has taken part in the transaction contemplated hereby in a manner consistent with granting them "good faith purchaser" status, and the protections concomitant with such status.

## NOTICE OF SALE AND HEARING

35.     Bankruptcy Rule 6004 states, in part, as follows:

(a)  <u>Notice of Proposed Use, Sale or Lease of Property.</u>  Notice of a proposed use, sale or lease of property, other than in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), and (k)...

36.     This Application is being served in accordance with the applicable provisions of Federal Rule of Bankruptcy Procedure 2002 on (a) all of the Debtor's creditors; (b) all parties filing Notices of Appearance in these proceedings, and (c) the Office of the United States Trustee, so as to provide at least twenty one (21) days notice of the relief requested, thereby satisfying Federal Rule of Bankruptcy Procedure 2002(a)(2) and (k). Additionally, the Debtor respectfully submits that the descriptions and notices provided by this Application and exhibits hereto provide adequate notice of the terms and conditions of the proposed sale, thereby satisfying Federal Rule of Bankruptcy Procedure 2002(c)(1). Finally, no committee has been appointed herein, and therefore Federal Rule of Bankruptcy Procedure 2002(i) is not applicable. It is respectfully submitted that this notice constitutes good and sufficient service hereof.

37.     No previous request for the relief sought herein has been made to this Court.

14

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order

pursuant to Sections 363(b), (f) and (m) of Title 11 of the United States Code and

Federal Rules of Bankruptcy Procedure 2002 and 6004 (i) authorizing and approving

the sale of substantially all of the Debtor's assets, pursuant to the Sale Agreement

entered into with Counsel Press and under the Plan, to be conveyed free and clear of

all liens, claims, encumbrances and interests; (ii) Authorizing Payment to Debtor's

Secured Creditors at the Closing; (iii) Granting Good Faith Purchaser Status to Counsel

Press; together with other related relief as is just under the circumstances.

Dated:  Port Chester, New York
        December 21, 2020

                        Daniel S. Alter
                        Attorney for the Debtor
                        By: */s/ Daniel S. Alter*
                        360 Westchester Avenue   #316
                        Port Chester, New York 10573
                        (914) 393-2388

15

**EXHIBIT "A"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

Z & J, LLC d/b/a/ APPEAL TECH,                    Chapter 11
                                                  Case No.19-11502 (JLG)
                        Debtor.
-----------------------------------------------------------------x

**ORDER GRANTING DEBTOR'S MOTION, PURSUANT TO SECTIONS 363(b), (f)
AND (m) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND
6004, (i) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS AND (ii) GRANTING RELATED RELIEF**

**UPON** the motion, dated December 21, 2020 (the "Motion")[1] of Z& J, LLC d/b/a

Appeal Tech, the debtor and debtor in possession herein (the "Debtor"), for an Order (i)

pursuant to Sections 363(b), (f) and (m) of Title 11 of the United States Code (the

"Bankruptcy Code") and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule(s)")

6004 authorizing and approving the sale of substantially all of the Debtor's assets as set

forth in the Asset Purchase Agreement ("Sale Agreement") attached as Exhibit B to the

Motion (the "Purchased Assets"), to Counsel Press, Inc. ("Counsel Press" or "Buyer"), to

be conveyed free and clear of all liens, claims, encumbrances and interests, and (ii)

granting related relief; and there being due and sufficient notice of the Motion; and upon

the hearing held by the Court on the Motion on January 21, 2020; and upon the Court's

consideration of the Motion, any objections thereto, the record of the hearing, and the

testimony and evidence admitted at the hearing; and upon the record of this case; and

after due deliberation and sufficient cause appearing,

    **THE COURT HEREBY FINDS AND CONCLUDES:**

---
[1] Unless otherwise defined, herein, capitalized terms shall have the meanings ascribed to them in the Motion.

A.      That the Court has jurisdiction to decide the Motion pursuant to 28 U.S.C.

§§157(a)-(b) and 1334(b) and the Standing Order of Referral of Cases to Bankruptcy

Judges for the Southern District of New York dated July 10, 1984, as amended.  This is

a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).

B.      That venue of this proceeding in this district is proper under 28 U.S.C.

§§1408 and 1409.

C.      That: (i) due, proper, timely, adequate and sufficient notice of the Motion,

the hearing thereon and the proposed sale has been given pursuant to Bankruptcy

Rules 2002 and 6004 and provided to all parties entitled thereto, and no other or further

notice of the Motion is or shall be required, (ii) the proposed sale to the Buyer, as set

forth in the Sale Agreement is the highest and best offer for the Purchased Assets

under the circumstances, (iii) the Debtor has established good and sufficient business

justification for the proposed sale, which is in the best interests of the Debtor's estate

and creditors, (iv) the Debtor has established one or more of the grounds for the sale to

be free and clear of liens, claims and encumbrances under Section 363(f) of the

Bankruptcy Code, and (v) Buyer is a good faith purchaser within the meaning of 11

U.S.C. Section 363(m).

D.      The Debtor has articulated good and sufficient reasons for this Court to

grant the relief requested in the Motion, including, without limitation, adequate business

justification for the sale of the Purchased Assets pursuant to the Sale Agreement.

Compelling circumstances and sound business reasons exist to support the Debtor's

business judgment to sell the assets by private sale as is authorized under Bankruptcy

Rule 6004(f)(1).  The relief requested in the Motion is in the best interests of the Debtor,

2

its estate, its creditors and all other parties in interest.

     E.     The consideration provided by the Buyer pursuant to the Sale Agreement is fair and adequate and constitutes a reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia. The Purchase Price represents the highest or otherwise best offer received by the Debtor for the Purchased Assets.

     F.     The Buyer is purchasing the assets in good faith and is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, (i) the Buyer is not an "insider" of the Debtor as that term is defined in Section 101(31) of the Bankruptcy Code and (ii) negotiations and execution of the Sale Agreement were at arms' length, in good faith and without fraud or collusion. The terms and conditions of the Sale and the Sale Agreement, including without limitation the consideration provided therein are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code.

     G.     The Buyer is not a continuation of the Debtor or its estate, and there is no identity between the Buyer and the Debtor. The Buyer is not holding itself out to the public as a continuation of the Debtor. The Buyer is not a successor of the Debtor or its estate, and the sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtor.

     H.     The sale of the Purchased Assets to the Buyer is not being undertaken for the purpose of escaping liability for the Debtor's debts.

I.    The Debtor has full corporate power and authority to execute and deliver the Sale Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transaction contemplated by the Sale Agreement.

J.    The transfer of the Purchased Assets to the Buyer will be, as of the Closing Date, a legal, valid, and effective transfer of such assets and vests or will vest the Buyer, pursuant to section 363(f) of the Bankruptcy Code, with all right, title, and interest of the Debtor to the Purchased Assets, free and clear of all Liens (as defined in the Sale Agreement), claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances or interests of any kind or nature that have been, are or could be asserted against the Debtor or the Purchased Assets, whether known or unknown, whether arising prior to or subsequent to the commencement of the Debtor's Case.

K.    The Buyer would not have entered into the Sale Agreement and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets to the Buyer was not free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever, or if the Buyer would, or in the future could be liable for any of such Liens, claims, encumbrances, and other interests of any kinds or nature.

L.    The Debtor may sell the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever against the Debtor, its estate or any of the Purchased Assets because, in each case, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

4

M.    Given all of the circumstances of this Chapter 11 case and the adequacy
and fair value of the purchase price under the Sale Agreement, the proposed private
sale of the Purchased Assets to the Buyer pursuant to the Sale Agreement constitutes a
reasonable and sound exercise of the Debtor's business judgment and should be
approved.

N.    The consummation of the Sale is legal, valid, and properly authorized
under all applicable provisions of the Bankruptcy Code and Bankruptcy Rules, including,
without limitation, Sections 105(a), 363(b), 363(f), 363(m), and Bankruptcy Rule
6004(f)(1), and all of the applicable requirements of such sections have been complied
with respect to the Sale.

O.    This Order is being entered contemporaneously with the Court's order
approving the Stipulation and Order resolving the Adversary Proceeding and all claims
asserted by and against the parties to the Adversary Proceeding.  The sale of the
Purchased Assets to the Buyer is authorized pursuant to this Order.

**BASED UPON THE FOREGOING FINDINGS, IT IS HEREBY,**

**ORDERED,** that the findings set forth above and conclusions of law stated herein
shall constitute the Court's findings of fact and conclusions of law pursuant to
Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule
9014.  To the extent any finding of fact later shall be determined to be a conclusion of
law, it shall be so deemed.  To the extent any conclusion of law later shall be
determined to be a finding of fact, it shall be so deemed; and it is further

**ORDERED,** that the Motion and the relief requested therein is granted and
approved; and it is further

5

**ORDERED**, that any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, settled or otherwise resolved as set forth on the record at the hearing and/or memorialized pursuant to the terms of this Order (if any) are hereby denied and overruled on the merits with prejudice; and it is further

**ORDERED,** that the Sale Agreement and all of the terms and conditions therein are approved in its entirety; and it is further

**ORDERED**, that the Debtor is authorized and empowered to sell, transfer, convey and/ or assign to the Buyer under the Sale Agreement all of its right, title and interest in the Purchased Assets, free and clear of all Liens, security interests, debts, causes of action, obligations, leases, leaseholds or related interest of any kind, liabilities, interests, encumbrances, charges, mortgages and claims of any kind, nature, description or kind whatsoever whether fixed or contingent, perfected or unperfected except as expressly provided in the Sale Agreement (collectively, the "Interests"), with the sale proceeds to be distributed in accordance with this Order and the Plan. Any Liens existing against the Purchased Assets at the time of Closing of the sale, but not satisfied at such Closing, shall attach to the Cash Proceeds of the sale in the same priority, with the same validity and enforceability, and subject to the same defenses as they existed on the Purchased Assets immediately before such Closing and shall be resolved under the Plan and by further agreement by the parties or order of the Court; and it is further

**ORDERED**, that the Debtor and Kestan are hereby authorized and directed to (i) perform their obligations under and comply with the terms of the Sale Agreement and

execute and perform any additional agreements, instruments or documents that may be necessary or appropriate to implement the Sale Agreement and transactions contemplated thereunder; (ii) consummate the sale of the Purchased Assets in accordance with the terms and conditions of the Sale Agreement; and (iii) take all other and further actions necessary or appropriate to implement the sale of the Purchased Assets and perform their obligations under the Sale Agreement.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Interests, except as otherwise set forth in the Sale Agreement or this Order, shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order. However, the Debtor, the Buyer, and each of their respective officers, directors, employees, agents, and representatives are hereby authorized and empowered to take all actions and execute and deliver any and all agreements, instruments and documents that the Debtor or the Buyer deem necessary or appropriate to implement and effectuate the terms of the Sale Agreement and this Order; and it is further

ORDERED, that upon the Closing, (i) the sale transaction effects a legal, valid, enforceable and effective sale and transfer of all of the Debtor's rights, title, and interests in and to the Purchased Assets to the Buyer, and shall vest Buyer with all of the Debtor's rights, title, and interests in and to the Purchased Assets free and clear of all Interests of any kind whatsoever, known or unknown, except as expressly provided in this Order and the Sale Agreement, and (ii) the Sale Agreement, the sale of the Purchased Assets, and any agreements, instruments and documents contemplated

7

thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or any successor trustee appointed with respect thereto; and it is further

ORDERED, that all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding Interests of any kind or nature whatsoever in the Debtor or against the Debtor, or the Debtor's rights, title, and interests in the Purchased Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, those arising under, out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's business, or the transfer of the Debtor's rights, title, and interests in the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Purchased Assets, or the rights, title, and interests of the Debtor in such Purchased Assets. Following the Closing, no holder of an Interest against the Debtor or the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Interests; and it is further

ORDERED, that this Order is and shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title

8

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets. Upon the occurrence of the Closing, the Debtor, and all persons holding an Interest in the Purchased Assets immediately prior to the Closing are hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Purchased Assets (if any) as such Interests may have been recorded or may otherwise exist. All recorded Interests against the Purchased Assets shall be deemed stricken from their records, official and otherwise; and it is further

ORDERED, that if any person or entity which has filed statements or other documents or agreements evidencing Interests in the Purchased Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents required to document the release of such Interests, the Debtor and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets, with such Interests that are not paid at Closing to attach to the Cash Proceeds of the sale. Each and every federal, state and governmental agency or department and any other person or entity is hereby authorized and directed to accept any and all documents and instruments in connection with or

9

necessary to consummate the sale of the Purchased Assets contemplated by the Sale Agreement or evidence the release of Interests in the Purchased Assets; and it is further

**ORDERED**, that the Cash Proceeds of the sale of the Purchased Assets shall be deposited into the attorney escrow account of the Disbursing Agent, Debtor's special counsel, Mazzola Lindstrom, LLP, and shall be distributed in accordance with the Debtor's Plan or as otherwise authorized by the Court; and it is further

**ORDERED**, that upon the Closing, the Buyer shall not and shall not be deemed to: (i) be a successor to the Debtor or its estate under any theory of law or equity; (ii) have, de facto or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; (iii) be a mere continuation or substantial continuation of the Debtor or any enterprise of the Debtor; or (iv) be liable for any acts or omissions of the Debtor in the conduct of the Debtor's business or arising under or related to the Purchased Assets. None of the Buyer or the Purchased Assets shall have (i) any liability or responsibility for or be required to satisfy in any manner (whether at law or in equity, by payment, setoff or otherwise, directly or indirectly) any claim or any Interest against the Debtor, or (ii) any successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust law, environmental law, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the chapter

10

11 Case, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing or any taxes in connection with, or in any way relating to, the cancellation of debt of the Debtor; and it is further

ORDERED, the sale of the Purchased Assets to Buyer is approved pursuant to this Order and under the Plan.  To the fullest extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument or transfer executed in connection with or in furtherance of the Sale Transaction shall not be subject to any tax under any law imposing any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment due on the sale of the Purchased Assets in connection with or in furtherance of the Plan as confirmed by the Court and shall not be subject to any state, local or federal law imposing such tax and the appropriate state, local or federal government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment; and it is further

**ORDERED,** that Buyer is hereby granted "good faith purchaser" status in accordance with Section 363(m) of the Bankruptcy Code and is afforded all of the rights and protections provided by Section 363(m) of the Bankruptcy Code; and it is further

**ORDERED**, that the terms and provisions of the Sale Agreement and this Order shall be binding in all respects upon the Debtor, the Debtor's estate, the Buyer, all creditors of the Debtor, all holders of equity interests in the Debtor, and all other parties in interest; and it is further

**ORDERED**, that all parties referred to herein have submitted to the jurisdiction of the Bankruptcy Court with respect to all matters relating to or pertaining to this Order and the Sale Agreement; and it is further

**ORDERED**, that the Bankruptcy Court hereby retains jurisdiction to determine any contested matter arising in connection with this Order and the Sale Agreement on an expedited basis; and it is further

**ORDERED,** that nothing contained in any subsequent order of this Court (including without limitation, an order authorizing any sale of assets pursuant to sections 363, 365 or any other provision of the Bankruptcy Code, or a conversion of the chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or an order confirming any bankruptcy plan, or a dismissal of the chapter 11 Case) shall nullify, alter, conflict with or derogate from the provisions of this Order, and the provisions of this Order shall survive and remain in full force and effect; and it is further

**ORDERED**, that the failure to reference or specifically include any particular provisions of the Sale Agreement in the Motion or in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Sale

Agreement and the sale of the Purchased Assets be authorized and approved in their entirety; and it is further

ORDERED, that notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.

Dated:   New York, New York
         January __, 2020

_____
HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

13

EXHIBIT "B"

EXECUTION VERSION

# ASSET PURCHASE AGREEMENT

### by and among

### Z & J LLC d/b/a "AppealTech"
### ("Seller"),

### Michael Kestan

### ("Member")

### and

### Counsel Press Inc.
### ("Buyer")

### Dated as of December 18, 2020

*Confidential*

## Table of Contents

ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION ...............................................................2

1.1.   DEFINITIONS ........................................................................................................... 2
1.2.   RULES OF CONSTRUCTION................................................................................... 11


ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS ....................................................12

2.1.   PURCHASE AND SALE OF PURCHASED ASSETS .................................................. 12
2.2.   LIABILITIES. ......................................................................................................... 12
2.3.   NON-ASSIGNABLE ASSETS ................................................................................. 13


ARTICLE III CLOSING; PURCHASE PRICE; POST-CLOSING ADJUSTMENTS ..........................13

3.1.   CLOSING .............................................................................................................. 13
3.2.   CLOSING DELIVERIES AND ACTIONS. ................................................................ 14
3.3.   PAYMENT OF PURCHASE PRICE ......................................................................... 15
3.4.   PURCHASE PRICE ADJUSTMENTS. ...................................................................... 16
3.5.   ALLOCATION OF PURCHASE PRICE..................................................................... 16


ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES.....................16

4.1.   ORGANIZATION AND GOOD STANDING .............................................................. 17
4.2.   AUTHORITY........................................................................................................... 17
4.3.   NO CONFLICTS; CONSENTS. ............................................................................... 17
4.4.   FINANCIAL STATEMENTS ..................................................................................... 18
4.5.   ABSENCE OF CHANGES. ...................................................................................... 18
4.6.   MATERIAL CONTRACTS. ...................................................................................... 19
4.7.   TITLE TO PURCHASED ASSETS; SUFFICIENCY .................................................... 21
4.8.   REAL PROPERTY. ................................................................................................. 21
4.9.   INTELLECTUAL PROPERTY AND DATA PRIVACY. ................................................ 21
4.10.  LITIGATION .......................................................................................................... 24
4.11.  COMPLIANCE WITH LAWS; GOVERNMENTAL APPROVALS; ANTI-CORRUPTION. ......................................... 24
4.12.  EMPLOYEE MATTERS. .......................................................................................... 25
4.13.  EMPLOYEE BENEFIT MATTERS............................................................................. 26
4.14.  TAXES................................................................................................................... 27
4.15.  BROKERS.............................................................................................................. 28
4.16.  MATERIAL RELATIONSHIPS.................................................................................. 28
4.17.  UNDISCLOSED LIABILITIES.................................................................................. 28
4.18.  ACCOUNTS RECEIVABLE...................................................................................... 28
4.19.  DISCLAIMER ........................................................................................................ 28

*Confidential*

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER.............................................28

5.1.    ORGANIZATION AND GOOD STANDING ................................................................... 28
5.2.    AUTHORITY ...................................................................................................... 29
5.3.    NO CONFLICTS; CONSENTS. ................................................................................ 29
5.4.    LITIGATION ....................................................................................................... 29
5.5.    AVAILABILITY OF FUNDS .................................................................................... 29
5.6.    BROKERS .......................................................................................................... 30

ARTICLE VI COVENANTS ...........................................................................................30

6.1.    CONDUCT OF BUSINESS ...................................................................................... 30
6.2.    PRE-CLOSING ACCESS ........................................................................................ 31
6.3.    POST-CLOSING ACCESS AND INFORMATION. ........................................................ 32
6.4.    CONFIDENTIALITY; PUBLICITY. ........................................................................... 33
6.5.    BULK TRANSFER LAWS ....................................................................................... 34
6.6.    EMPLOYMENT MATTERS. .................................................................................... 34
6.7.    TAX MATTERS. .................................................................................................. 35
6.8.    POST-CLOSING DELIVERIES ................................................................................ 35
6.9.    FURTHER ASSURANCES ....................................................................................... 35
6.10.   EXPENSES ......................................................................................................... 35
6.11.   NO AFFILIATION. ............................................................................................... 35
6.12.   CONTACT WITH PERSONS REGARDING THE BUSINESS. ............................................ 35
6.13.   RESTRICTIVE COVENANTS OF THE SELLER PARTIES. ............................................. 36
6.14.   CHANGE AND USE OF SELLER NAME. ................................................................... 37
6.15.   BANKRUPTCY COURT APPROVAL ........................................................................ 38
6.16.   BANKRUPTCY COURT FILINGS AND PROCEDURES ................................................. 38

ARTICLE VII CONDITIONS PRECEDENT ........................................................................40

7.1.    CONDITIONS TO OBLIGATIONS OF EACH PARTY ................................................... 40
7.2.    CONDITIONS TO OBLIGATIONS OF BUYER ............................................................ 40
7.3.    CONDITIONS TO OBLIGATIONS OF SELLER ........................................................... 41
7.4.    FRUSTRATION OF CLOSING CONDITIONS .............................................................. 42

ARTICLE VIII TERMINATION .......................................................................................42

8.1.    TERMINATION ................................................................................................... 42
8.2.    EFFECT OF TERMINATION ................................................................................... 43

ARTICLE IX INDEMNIFICATION ...................................................................................43

9.1.    INDEMNIFICATION BY SELLER PARTIES ............................................................... 43
9.2.    INDEMNIFICATION BY BUYER ............................................................................. 44
9.3.    LIMITATIONS .................................................................................................... 44

*Confidential*

| 9.4. | ESCROW | 45 |
|------|--------|----|
| 9.5. | INDEMNIFICATION CLAIMS | 46 |
| 9.6. | THIRD-PARTY CLAIMS | 46 |
| 9.7. | ADJUSTMENT TO PURCHASE PRICE | 47 |

**ARTICLE X MISCELLANEOUS** ............................................................... 47

| 10.1. | SEVERABILITY | 47 |
|-------|-------------|----|
| 10.2. | NOTICES | 48 |
| 10.3. | ENTIRE AGREEMENT | 49 |
| 10.4. | COUNTERPARTS | 49 |
| 10.5. | SPECIFIC PERFORMANCE | 49 |
| 10.6. | GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE; WAIVER OF JURY TRIAL. | 49 |
| 10.7. | BINDING EFFECT | 50 |
| 10.8. | ASSIGNMENT | 50 |
| 10.9. | NO THIRD PARTY BENEFICIARIES | 50 |
| 10.10. | AMENDMENT; WAIVERS, ETC. | 50 |
| 10.11. | DISCLOSURE SCHEDULE. | 51 |

## LIST OF EXHIBITS

Exhibit A:   Forms of Bill of Sale and Assignment and Assumption Agreement
Exhibit B:   Form of Escrow Agreement
Exhibit C:   Form of Seller Note
Exhibit D:   Purchase Price Allocation
Exhibit E:   Form of Pending Litigation Mutual Release/Dismissal of Claims with Prejudice
Exhibit F:   Form of Sale Order

*Confidential*

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>") is made and entered into as of December 18, 2020 (the "<u>Effective Date</u>"), among Z & J LLC d/b/a "AppealTech", a limited liability company organized under the laws of Delaware ("<u>Seller</u>"), Michael Kestan, the sole member of the Seller (the "<u>Member</u>") and together with Seller, the "<u>Seller Parties</u>") and Counsel Press Inc., a corporation organized under the laws of Delaware ("<u>Buyer</u>").

## Recitals

A.    WHEREAS, Seller is primarily engaged in the business of organizing, preparing and filing appellate briefs, records and appendices and providing related services (collectively, the "<u>Business</u>").

B.    WHEREAS, Seller is a debtor and debtor in possession under Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief (the "<u>Filing</u>") under Chapter 11 of the Bankruptcy Code on May 9, 2019 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), where such bankruptcy case is administered under Case No. 19-11502 (JLG) (the "<u>Bankruptcy Case</u>").

C.    WHEREAS, Seller desires to sell, assign and transfer to Buyer, and Buyer desires to purchase substantially all of the assets used or held for use by Seller in the Business (the "<u>Purchased Assets</u>"), on the terms and subject to the conditions of this Agreement.

D.    WHEREAS, the Parties intend to effectuate the transactions contemplated hereby, including the purchase and sale of the Purchased Assets (the "<u>Asset Purchase</u>"), pursuant to Section 363 of the Bankruptcy Code;

E.    WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions contemplated hereby are subject, among other things, to the entry of the Sale Order (as defined below) pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code.

F.    WHEREAS, the Parties desire to consummate the transactions contemplated hereby promptly after the Bankruptcy Court enters the Sale Order.

G.    WHEREAS, the Member owns all of the outstanding equity interests of Seller and will benefit from the consummation of the transactions contemplated by this Agreement.

**Agreement**

In consideration of the respective representations, warranties, covenants and agreements in this Agreement, the parties hereby agree as follows:

## ARTICLE I
### DEFINITIONS; RULES OF CONSTRUCTION

1.1.    Definitions.

(a)    Defined Terms.  For purposes of this Agreement, the following terms shall have the following meanings:

"Affiliate" means, for any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means the Bill of Sale, Assignment and Assumption Agreement, Escrow Agreement, and the other documents and instruments described in Section 3.2.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act, 15 U. S. C. §§ 78m, 78dd-1, et seq. as amended, and all anti-corruption or anti-bribery Laws of any other jurisdiction.

"Benefit Plan" means an "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any other benefit plan, program, agreement or arrangement of any kind, whether written or oral, including any: stock option, stock appreciation rights, stock purchase, profits interests or other equity-related incentive compensation, bonus or other incentive compensation plan, arrangement regarding any vacation, holiday, or sick leave, fringe benefits, health, life or disability insurance or other welfare benefits, educational assistance, pre-Tax premium or flexible spending account plan, or any other material benefits.

"Bill of Sale, Assignment and Assumption Agreement" means the Bill of Sale and Assignment and Assumption Agreement, each by and between Buyer and Seller, dated as of the Closing Date, substantially in the form attached hereto as Exhibit A.

"Books and Records" means books, records, files, documentation, manuals and other materials or similar information, including financial and accounting records; sales literature and promotional materials; price lists; customer and service provider lists; referral sources; and purchasing materials and records in whatever form maintained by Seller in the Ordinary Course.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as amended.

- 2 –

"Closing Instrument" means any document delivered by a party at the Closing.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1986, Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state applicable Law.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Company Owned Intellectual Property" means Intellectual Property owned or purportedly owned by Seller, including Company Registered Intellectual Property.

"Company Registered Intellectual Property" means Registered Intellectual Property owned or purportedly owned by Seller.

"Confidentiality Agreement" means the Mutual Confidentiality and Nondisclosure Agreement by and between Buyer and Seller, dated April 24, 2020.

"Consent" means any consent, waiver, approval, Order, permit, license, approval or authorization of, or registration, declaration or filing with, or notification to any Governmental Authority or other Person.

"Contract" means any written agreement, lease, license, contract, note, mortgage, indenture or other obligation, commitment or instrument that is legally binding, including all amendments thereto.

"Control," as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person through the ownership of a majority of the voting securities of such Person, by contract or otherwise.

"Core Representation" means, as applicable, any of the representations and warranties of the Seller Parties set forth in Sections 4.1, 4.2, 4.7(a), 4.13, 4.14, 4.15 and 4.16 or Buyer set forth in Sections 5.1, 5.2 and 5.6.

"COVID-19" means the infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) and commonly known as "COVID-19."

"COVID-19 Pandemic" means the pandemic caused by COVID-19 which, as of the date hereof, has spread throughout the world and has resulted in Governmental Authorities implementing numerous measures to try to contain COVID-19, including travel bans and restrictions, quarantines, shelter in place orders and shutdowns.

"Data Protection Law" means any applicable Law governing or regulating the collection, use, processing, disclosure, destruction, breach notification, security, or retention of individually identifiable information.

– 3 –

"Data Room" means, collectively, all of the documents in the virtual data room that were made available to Buyer for diligence purposes prior to the date of this Agreement.

"Disclosure Schedule" means the Disclosure Schedule that has been prepared by Seller in accordance with Section 10.11 and delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"Employee" means each employee, whether active or on approved leave, of Seller as of the date of this Agreement.  All Employees are listed in Schedule 1.1(b).  Schedule 1.1(b) includes, as to each Employee, the Employee's (i) employment location, (ii) date of hire, (iii) current job title, (iv) current annual salary, (v) current bonus and/or commission potential, (vi) classification by Seller as exempt or non-exempt, and (vii) any commitment to pay an amount or benefit in connection with a termination of employment (contingent or otherwise) or in connection with a change of control.

"Enforcement Limitation" means any applicable bankruptcy, reorganization, insolvency, moratorium or other similar Law affecting creditors' rights generally and principles governing the availability of equitable remedies.

"Environmental Law" means any applicable Law relating to pollution or protection of the environment, including any law relating to any emission, discharge, human exposure, release or possible release of any pollutant, contaminant, hazardous or toxic material, substance or waste into air, surface water, improvements, groundwater or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any pollutant, contaminant or hazardous or toxic material, substance or waste.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"ERISA Affiliate" shall mean any entity required to be aggregated with Seller under Section 414(b), (c), (m), or (o) of the Code.

"Escrow Agreement" means the escrow agreement, by and among Buyer, Seller and the Escrow Agent, to be dated as of the Closing Date, substantially in the form attached hereto as Exhibit B.

"Escrow Amount" means $412,500.

"Excluded Assets" means:

(i)    all minute books, stock ledgers, books of account, employee-related or employee benefit-related files or records, tax identification numbers, Tax Returns and Tax records, Organizational Documents and other documents and information relating to the organization and existence of Seller (collectively, the "Seller Records"), and any other Books and Records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and are required by applicable Law to retain;

– 4 –

(ii)    all securities, bank accounts, deposit accounts, investment accounts and similar accounts (collectively, "Accounts") of Seller (provided that all cash and cash equivalents balances of Seller in any such accounts as of the Closing shall be Purchased Assets and transferred to Buyer at Closing);

(iii)    all rights to Tax refunds, credits or similar benefits relating to the ownership of the Purchased Assets or the operation of the Business on or before the Closing Date;

(iv)    all of Seller's rights under any Contract (other than any such rights pertaining to any Purchased Assets);

(v)    any Benefit Plan sponsored, maintained, contributed to or required to be sponsored, maintained or contributed to by Seller or any ERISA Affiliate;

(vi)    all insurance policies of Seller and insurance coverage thereunder, and any refunds due from, or payments due on, claims with the insurers of any of the Seller in respect of losses arising prior to the Closing Date;

(vii)    all rights of Seller under the Confidentiality Agreement, this Agreement and any Ancillary Agreement; and

(viii)    the assets listed on Schedule 1.1(c).

"Excluded Liabilities" means all Liabilities of Seller of whatever nature.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, Excluded Liabilities shall include any Liability for or in respect of (i) any Benefit Plan sponsored, maintained or otherwise contributed to, or required to be sponsored, maintained or contributed to, by or on behalf of Seller or any ERISA Affiliate, or any employment agreement or otherwise relating to any current or former employee, director or consultant of Seller and his service or employment by Seller (except as expressly set forth in Section 6.6(a) below), (ii) the payment of all Taxes and assessments which are required to be paid or remitted by Seller, including, without limitation, all excise Taxes, sales and use Taxes, payroll withholding Taxes, FICA Taxes, unemployment Taxes, business Taxes and real and personal property Taxes, (iii) any Taxes arising out of or relating to the ownership or use of the Purchased Assets or the operation of the Business on or before the Closing Date except for any Taxes relating to Buyer's financing transactions and (iv) Liabilities under any Contract, any Indebtedness, and any working capital obligations.

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time.

"Governmental Approval" means any Consent of, with or to any Governmental Authority.

"Governmental Authority" means any:  (i) nation, state, county, city, district or other similar jurisdiction of any nature; (ii) federal, state, local or foreign government;

- 5 –

19-11502-jlg   Doc 98   Filed 12/21/20   Entered 12/21/20 16:45:03   Main Document
Pg 43 of 90

(iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, commission, bureau, instrumentality, department, official, entity, court or tribunal); (iv) multi-national organization or body; or (v) body or other Person entitled by applicable Law to exercise any arbitrative, administrative, executive, judicial, legislative, police, regulatory or Taxing authority or power.

"Hazardous Substances" means any chemicals, materials or substances regulated by any Environmental Law.

"Indebtedness" means, with respect to any Person and without duplication, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees, premiums and expenses) of such Person: (i) for indebtedness for borrowed money; (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments; (iii) for the deferred purchase price of property or services (including trade payables incurred in the Ordinary Course or otherwise); (iv) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee (but not, for the avoidance of doubt, any equipment leases); (v) in respect of letters of credit (including letters of credit in support of trade payables); (vi) under interest rate, currency or other hedging transactions (valued at the termination value thereof); and (vii) for guarantees having the economic effect of a guarantee of any indebtedness of any other Person.

"Indemnified Party" means a Buyer Indemnified Party or a Seller Indemnified Party, as applicable.

"Intellectual Property" means any trademark, service mark, trade name, trade dress, brand name, business name, logo, together with all translations, adaptations, derivations, and combinations, and the goodwill symbolized by or associated with any of the foregoing (collectively, "Marks"), goodwill, patent, copyright, copyrightable materials, design, formula, invention, concept, domain name, website, URL, social media accounts (including Facebook and LinkedIn), trade secret, know-how, confidential or proprietary information (including ideas, production processes and techniques, plans, proposals, technical data, financial, business and marketing information and plans, and customer and supplier lists, pricing and cost information, and related information), mask work, work of authorship, product right, software code (in source code, object code, pseudo code, and executable code), software programs and databases, programmer notes and comments, compilers and compilation information, technology or other similar intangible asset of any nature, whether in use, under development or design or inactive, and any other type of proprietary intellectual property right, and all embodiments and fixations thereof and related documentation, registrations and franchises and all additions, improvements and accessions thereto, whether published or unpublished, registered or unregistered, or domestic or foreign (including any registration, application or renewal regarding any of the foregoing), any rights of priority for any of the foregoing, licenses or other agreements to or from third parties regarding the foregoing, and rights to income, royalties, damages and payments due or payable on the Closing Date or thereafter, including the right to enforce and collect damages for past, present or future infringements or misappropriations thereof, and any and all corresponding rights or interests that, now or hereafter, may be secured throughout the world.

- 6 –

"IP Assignment" means an assignment in form and substance reasonably satisfactory to Buyer's counsel to effect the assignment of the Company Owned Intellectual Property from Seller to Buyer at the Closing.

"Knowledge" of Seller, "Seller's Knowledge" or any similar reference means, with respect to a particular fact or other matter, actual awareness of such fact or other matter by Michael Kestan or any Vice President of Seller, after reasonable inquiry.

"Law" means any statute, law (including the common law), treaty, code, constitution, ordinance, rule, order, ruling, judgment, injunction, decree, restriction, ordinance or regulation of any Governmental Authority.

"Liability" means any liability or obligation of any kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"Lien" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal or charge.

"Limited Indemnification Claim" means any indemnification claim pursuant to Section 9.1(a) or Section 9.2(a), as applicable, but only to the extent it is not related to a Core Representation or fraud.

"Loss" means any and all Liabilities, damages, costs and expenses (including reasonable attorneys' fees and expenses) and costs of enforcement.

"Material Adverse Effect" means any change, event, circumstance, condition or effect that is or would reasonably be expected to be materially adverse to (i) the Seller Parties' ability to consummate the Transactions, or (ii) the financial condition, business or results of operations of the Business or the Seller Parties, taken as a whole, except, solely for purposes of this clause (ii) and, in the case of clauses (A) through (C), to the extent that the Seller Parties are not materially disproportionately affected thereby, to the extent that any such change, event, circumstance, condition or effect results from:  (A) changes in general economic conditions, or conditions in the legal services industry generally; (B) changes in applicable Law or accounting principles applicable to the Seller Parties before or after the Effective Date, or the enforcement, implementation or interpretation thereof; (C) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (D) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof;  or (E) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the consent of or at the request of Buyer.

"Open Source Software" means any software distributed under any license that requires that any other software incorporated into, derived from, linked to, or distributed with such software (i) be disclosed, distributed or made available in source code form, (ii) be licensed for

the purposes of making modifications or preparing derivative works, (iii) be distributed at no charge, (iv) distributed with certain notices or licenses (e.g., copyright notices or warranty disclaimers), or (v) be licensed under terms that allow such other software to be reverse engineered (other than by operation of law).

"Order" means any award, decision, injunction (whether temporary, preliminary or permanent), judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Governmental Authority or arbitral body.

"Ordinary Course" means, with respect to a Person, the ordinary and usual course of normal day-to-day operations of such Person, consistent with such Person's past practice including as to quantity, quality and frequency.

"Organizational Documents" means, as applicable, the certificate of incorporation or formation, bylaws, limited liability company agreement or similar governing documents of an entity, as amended and/or restated from time to time.

"Permitted Liens" means Liens (regardless of the nature of such Liens) which will be fully released and discharged or assigned at Closing.

"Person" means any natural person, firm, partnership, association, corporation, company, trust, business trust, Governmental Authority or other entity.

"Proceedings" means any action, cause of action, claim, arbitration, charge, complaint, hearing, proceeding, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, investigated by or otherwise involving, any Governmental Authority.

"Purchased Assets" means the properties, assets and rights of every nature, whether real, personal, tangible, intangible or otherwise, of Seller used or held for use in the Business (other than the Excluded Assets), including the following:

      (a)     goodwill;

      (b)     supplies (including advertising and promotional materials), raw materials, work-in-process and other inventory;

      (c)     cash and cash equivalents of Seller as of immediately prior to the Closing (including any amounts held in any Accounts as of immediately prior to the Closing), and accounts receivable (including any notes receivable) and other payment rights as of immediately prior to the Closing;

      (d)     rights relating to prepayments, deferred charges, security deposits and similar items and all customer deposits and advances relating to customer orders pending at Closing and for which the applicable customer has entered into a new agreement with Buyer to be performed by Buyer after the Closing (and for the avoidance of doubt, Buyer is not assuming any Liabilities of Seller with respect to any such customer orders);

- 8 -

(e)     equipment, furnishings, fixtures, vehicles and similar property, including computer and telecommunications hardware and software and information technology systems;

(f)     the Transferred Intellectual Property and the name "AppealTech" and any derivations thereof;

(g)     all claims, causes of action and rights of Seller relating to the Proceeding captioned Z&J, LLC d/b/a AppealTech v. Laurence Mynes, et al, before the Bankruptcy Court as a part of the Bankruptcy Case (the "Pending Litigation"), and all claims, causes of action, payment rights, audit rights, and all other rights relating to the Purchased Assets or relating to the Business;

(h)     all telephone and facsimile numbers, all rights to receive mail and other communications addressed to Seller and other directory listings used in connection with the Business;

(i)     all rights of Seller and its Affiliates under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with any Person related to the Business, including those listed on Schedule 1.1(a)(i);

(j)     Books and Records; and

(k)     Governmental Approvals, including pending applications therefor or renewals thereof, to the extent their transfer is permitted by Law.

"Registered Intellectual Property" means all United States and foreign (a) patents and patent applications; (b) registered Marks, applications to register Marks (including applications to register Marks filed on an intent-to-use basis), Internet domain name registrations, social media accounts, assumed name registrations or trade name registrations; and (c) registered copyrights and applications to register copyrights (including active and inactive registrations or applications of the foregoing).

"Representatives" means, collectively, a party's accountants, financial advisors, counsel, consultants, employees and agents.

"Restricted Parties" means the Seller Parties and their Affiliates, but shall not include any Employee (other than the Member) as that term is defined herein.

"Restricted Period" means the period commencing on the Closing Date and ending on the seventh anniversary of the Closing Date.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated hereby.

"Sale Motion" means one or more motions, in form and substance satisfactory to Buyer, filed by Seller pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to secure entry of the Sale Order by the Bankruptcy Court.

"Sale Order" means a Final Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit F, with any changes approved by Buyer in their entirety, pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code and consistent with Section 6.16(d)

- 9 –

(i) approving this Agreement and the terms and conditions hereof, (ii) authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein free and clear of all Liens (other than Permitted Liens), and (iii) containing certain findings of facts, including, without limitation, a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

"Subsidiary" means with respect to any Person, any other Person of which at least a majority of the securities or other interests, having by their terms ordinary voting power to elect a majority of the board of directors (or similar governing body) of such other Person, is directly or indirectly owned or controlled by such first Person or by any one or more of such first Person's Subsidiaries.

"Tax" means any federal, state, provincial, local, foreign or other income, alternative, minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto) whether disputed or not.

"Tax Return" means any return, report, declaration, form, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employee" means each Employee who accepts an offer of employment by, and commences employment with, the Buyer in accordance with the terms of Section 6.6(a).

"Transferred Intellectual Property" means the Intellectual Property owned, purportedly owned, or licensed by the Seller that is related to, used or held for use in connection with the Business, including the Intellectual Property set forth on Schedule 1.1(f).

"Treasury Regulations" means the regulations prescribed pursuant to the Code.

(b)    Terms Defined Elsewhere in this Agreement. Capitalized terms defined in other provisions of this Agreement shall have the meanings specified therein. Those terms include the following:

- 10 –

| Term | Section |
|------|---------|
| Agreement | Opening paragraph |
| Base Purchase Price | 3.3 |
| Basket | 9.3(c) |
| Business | Recitals |
| Business Pre-Closing Books and Records | 6.4(b) |
| Business Systems | 4.9(g) |
| Buyer | Opening paragraph |
| Buyer Indemnified Party | 9.1 |
| Buyer Related Agreements | 5.2 |
| Cap | 9.3(c) |
| Cash Adjustment Amount | 3.4(a) |
| Claim Notice | 9.5 |
| Closing | 3.1 |
| Closing Accounts Receivable | 3.4(b) |
| Closing Date | 3.1 |
| Covered Loss | 9.3(b) |
| Effective Date | Opening paragraph |
| Escrow Account | 3.3(a) |
| Escrow Agent | 3.3(a) |
| Financial Statements | 4.4 |
| Forward Looking Statements | 5.7 |
| Indemnifying Party | 9.3(a) |
| Interim Balance Sheet Date | 4.4 |
| Interim Financial Statements | 4.4 |
| Marks | Definition of Intellectual Property |
| Material Contracts | 4.6(b) |
| Maximum Cash and Receivables Payment | 3.4(b) |
| Privacy and Security Requirements | 4.9(i) |
| Purchase Price | 3.3 |
| Seller | Opening paragraph |
| Seller Indemnified Parties | 9.2 |
| Seller Note | 3.3(b) |
| Seller Records | Definition of Excluded Assets |
| Seller Related Agreements | 4.2 |
| Termination Date | 9.3(a) |
| Third-Party Claim | 9.6 |
| Transfer Taxes | 6.7(a) |
| Updated Disclosure Schedule | 10.11(b) |

1.2.    Rules of Construction.

(a)    Elements of this Agreement; Schedules.  When a reference is made in this Agreement to a Recital, an Article, a Section or a Schedule or Exhibit, such reference is to a

- 11 –

Recital, Article or Section of, or a Schedule or Exhibit to, this Agreement, unless otherwise indicated. The words "hereof," "herein," "hereto," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement or Articles, Sections, Exhibits and Schedules of the Agreement unless otherwise expressly specified. All Schedules and Exhibits attached to this Agreement and referred to herein are incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall have the meanings specified in this Agreement. Article, Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of any provision of this Agreement.

(b)     <u>Interpretation of Agreement</u>. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(c)     <u>Other Rules of Construction</u>. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be understood to be followed by the words "without limitation." Unless otherwise specified in a particular case, the word "days" refers to calendar days. Pronouns, including "he," "she" and "it," when used in reference to any person, shall be deemed applicable to entities or individuals, male or female, as appropriate in any given case. Standard variations on defined terms (such as the plural form of a term defined in the singular form, and the past tense of a term defined in the present tense) shall be deemed to have meanings that correlate to the meanings of the defined terms. With respect to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including." The word "or" has the inclusive meaning represented by the phrase "and/or" unless the context otherwise requires. A reference to any Person shall include such Person's successors and permitted assigns.

## ARTICLE II
### PURCHASE AND SALE OF PURCHASED ASSETS

2.1.     <u>Purchase and Sale of Purchased Assets</u>. On the terms and subject to the conditions hereof, at the Closing, Seller shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase and accept, all right, title and interest of Seller in and to the Purchased Assets, free and clear of all Liens other than Permitted Liens. For clarity, no Excluded Asset shall be sold, transferred, assigned or delivered by Seller to Buyer.

2.2.     <u>Liabilities</u>. NOTWITHSTANDING ANY PROVISION HEREIN TO THE CONTRARY, BUYER SHALL NOT ASSUME, AND BUYER SHALL NOT IN ANY MANNER BECOME LIABLE FOR, ANY LIABILITIES OR OBLIGATIONS OF SELLER, OF ANY KIND OR NATURE. THE SELLER PARTIES SHALL BE SOLELY AND EXCLUSIVELY LIABLE WITH RESPECT TO ALL LIABILITIES OF SELLER AND SHALL PAY OR PERFORM THE EXCLUDED LIABILITIES IN ACCORDANCE WITH THEIR TERMS.

2.3.    Non-Assignable Assets.    Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 2.3, to the extent that the sale, transfer, assignment or delivery, or attempted sale, transfer, assignment or delivery, to Buyer of any Purchased Asset would require the Consent of a Third Party (including any Governmental Authority), and such Consent shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, transfer, assignment or delivery, or an attempted sale, transfer, assignment or delivery, thereof; provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof.  Following the Closing, Seller at its sole cost and expense shall obtain any such required Consent, and once such Consent is obtained, Seller shall sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such Consent relates for no additional consideration.  In connection with and as a prerequisite to such assignment Seller shall pay in full all costs to cure all defaults under any Contract included in the Purchased Assets to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "Cure Costs") and Buyer shall have no liability or obligation for any such costs.

### ARTICLE III
### CLOSING; PURCHASE PRICE; POST-CLOSING ADJUSTMENTS

3.1.    Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the sale and purchase of the Purchased Assets (the "Closing") shall take place remotely via the exchange of documents and signatures on the second Business Day following the satisfaction or waiver (to the extent permitted by Law) of all conditions set forth in Article VII (other than conditions that by their terms are to be satisfied at Closing but subject to the satisfaction or waiver of such conditions), or on such other date as the parties may agree to in writing (the "Closing Date").  All actions to be taken and all documents to be executed or delivered at Closing will be deemed to have been taken, executed and delivered simultaneously, and no action will be deemed taken and no document will be deemed executed or delivered until all have been taken, delivered and executed, except in each case to the extent otherwise stated in this Agreement or any such other document.  The Closing will be effective as of 12:01 a.m. on the Closing Date.

Seller hereby appoints the Member as agent and attorney-in-fact for Seller, to give and receive notices and communications and to take any and all action on behalf of Seller pursuant to this Agreement, the Ancillary Agreements, and in connection with the transactions contemplated hereby and thereby, whether prior to or after the Closing, and following the liquidation of Seller in accordance with Seller's approved Plan of Liquidation in the Bankruptcy Case. Notices or communications to or from the Member will constitute notice to or from Seller. A decision, act, consent, or instruction of the Member will constitute a decision of Seller and will be final, conclusive, and binding upon Seller, and Buyer may rely upon any such decision, act, consent, or instruction of the Member as being the decision, act, consent, or instruction of Seller. Buyer is hereby relieved from any liability to any Person for any acts done by Buyer in accordance with such decision, act, consent, or instruction of the Member.

3.2.   Closing Deliveries and Actions.

(a)   Buyer's Deliveries.   At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Buyer shall pay or cause to be paid the cash portion of the Purchase Price in accordance with Section 3.3 and shall deliver to Seller (duly executed by Buyer as applicable):

(i)      the Seller Note;

(ii)     the Bill of Sale and Assignment and Assumption Agreement;

(iii)    the Escrow Agreement;

(iv)     Documents substantially in the form of Exhibit E hereto dismissing with prejudice the Pending Litigation, and implementing mutual releases of Buyer, Seller and their Affiliates with respect to all claims and liabilities arising out of or relating to any of the matters asserted in the Pending Litigation;

(v)      a certificate of good standing with respect to Buyer;

(vi)     a certificate, dated the Closing Date, of an officer of Buyer certifying as to the matters specified in Section 7.3(a) and Section 7.3(b) hereof; and

(vii)    a customary secretary's certificate as to Buyer's organizational documents, the incumbency of its officers and resolutions authorizing the Transactions.

(b)   Seller's Deliveries. At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Seller shall deliver to Buyer (duly executed by Seller and Member, as applicable):

(i)      the Closing Accounts Receivable Schedule;

(ii)     the Bill of Sale and Assignment and Assumption Agreement and the IP Assignment;

(iii)    the Escrow Agreement;

(iv)     (A) customary payoff letters and UCC-3 termination statements and other lien release documentation reasonably satisfactory to Buyer relating to the termination of all Liens related to the Purchased Assets; (B) appropriately executed Consents as listed on Schedule 3.2(b) and (C) duly executed employment agreements satisfactory in form and substance to Buyer with those employees of Seller designated by Buyer in writing prior to Closing;

(v)      a copy of the final Sale Order satisfactory in form and substance to Buyer in its discretion;

- 14 -

(vi)     documents substantially in the form of Exhibit E hereto duly executed on behalf of Seller and its Affiliates dismissing with prejudice the Pending Litigation, and mutual releases of Buyer, Seller and their Affiliates with respect to all claims and liabilities arising out of or relating to any of the matters asserted in the Pending Litigation;

(vii)    a certificate of good standing with respect to Seller;

(viii)   possession of the Books and Records and other Purchased Assets,

(ix)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer in form and substance reasonably satisfactory to Buyer's counsel to effectuate the conveyance, transfer, assignment and delivery of the Purchased Assets;

(x)      a FIRPTA certificate, dated as of the Closing Date, in form and substance reasonably acceptable to Buyer that each Seller Party is not a foreign person for purposes of Regulation Section 1.1445-2(b);

(xi)     a certificate, dated the Closing Date, of an officer of Seller certifying as to the matters specified in Section 7.2(a) and Section 7.2(b) hereof; and

(xii)    a customary secretary's certificate of each Seller Party that is an entity as to its organizational documents, incumbency of its officers and resolutions authorizing the Transactions.

3.3.   Payment of Purchase Price.   On the terms and subject to the conditions hereof, at the Closing, Buyer shall pay or cause to be paid to Seller an aggregate amount equal to $5,000,000 (the "Base Purchase Price"), subject to adjustment as provided in Section 3.4 (as adjusted, the "Purchase Price").   At the Closing, the Buyer shall make the following payments and deliveries on account of the Purchase Price (by wire transfer of immediately available funds with respect to any cash payments):

(a)      Buyer shall deposit with Wilmington Trust, NA, as escrow agent (the "Escrow Agent"), the Escrow Amount to be held in an account in the name of Buyer (the "Escrow Account") pursuant to the terms of this Agreement and the Escrow Agreement;

(b)      Buyer shall deliver to Seller a promissory note in the principal amount of $1,000,000 in the form attached as Exhibit C hereto, and Seller hereby directs that such note shall be payable to the Member (the "Seller Note"), and

(c)      Buyer shall pay to Seller the remaining balance of the Base Purchase Price to an account or accounts designated by Seller at least two Business Days prior to the Closing Date as the distribution fund in accordance with the Seller's approved Plan of Liquidation in the Bankruptcy Case.

3.4.    <u>Purchase Price Adjustments</u>.

(a)    <u>Cash</u>.  On the Closing Date, Buyer and Seller shall agree on the aggregate amount of cash and cash equivalents included in the Purchased Assets as of the Closing (the "<u>Cash Adjustment Amount</u>"), and the Base Purchase Price shall be increased by an amount equal to the Cash Adjustment Amount, provided that the sum of the Cash Adjustment Amount and the payments pursuant to Section 3.4(b) on account of the Closing Accounts Receivable shall not exceed the Maximum Cash and Receivables Payment.

(b)    <u>Receivables</u>.  Following the Closing until the second anniversary of the Closing Date (the "<u>Collection Period</u>"), Buyer shall use good faith efforts to collect the Closing Accounts Receivable consistent with past practice in the ordinary course of business, provided that (i) Buyer shall not be obligated to commence any Proceedings, incur any third party expenses or make any concessions with any customer in connection with such collections, and (ii) Buyer shall apply any payments on account of the Closing Accounts Receivable as directed by the customer, or, in the absence of such direction or a pending customer dispute with respect to an invoice, such payments shall be applied to the oldest invoices first.  Buyer shall pay to the Member (and the Seller hereby directs the Buyer to make such payments to the Member) no later than the 10th day of each month during the Collection Period the net amount of any Closing Accounts Receivable actually collected during the immediately preceding month, net of any commissions payable on account of such Closing Accounts Receivable, provided that the sum of the Cash Adjustment Amount and the aggregate payments by Buyer on account of the Closing Accounts Receivable shall not exceed $500,000 (the "<u>Maximum Cash and Receivables Payment</u>").  "<u>Closing Accounts Receivable</u>" means the accounts receivable of the Seller as of the Closing included in the Purchased Assets as reflected in the Closing Accounts Receivable Schedule as agreed to by Buyer and Seller on the Closing Date.  For the avoidance of doubt, this Section 3.4 shall be applicable solely to payments on account of the Closing Accounts Receivable, and Buyer shall not have any obligation to apply any payments to Buyer on account of any accounts receivable or other obligation owed to Buyer that is not a Closing Accounts Receivable to any Closing Accounts Receivable of such payor.

3.5.    <u>Allocation of Purchase Price</u>.  The parties agree to allocate the Purchase Price, and other relevant items among the Purchased Assets in accordance with the allocation schedule set forth on <u>Exhibit D</u>.  After Closing, the parties will, and will cause their respective Affiliates to, make consistent use of such allocation, as adjusted to reflect any adjustments to the Purchase Price, for all Tax purposes.  Each party agrees that it shall not take a position on any income, transfer, gains or other Tax Return, or before any Governmental Authority charged with the collection of any Tax or in any judicial Proceeding, that is in any manner inconsistent with the terms of any such allocation unless required by applicable Law.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES

Except as set forth in the Disclosure Schedule, each Seller Party represents and warrants as follows:

4.1.    <u>Organization and Good Standing</u>.    If such Seller Party is an entity, it is duly organized, validly existing and in good standing under the Laws of the State of Delaware, with all requisite power and authority to conduct its business as now conducted and to own and lease its properties and assets.    Seller is duly qualified or licensed to do business and is in good standing in each other jurisdiction in which the nature of its business or location of its assets requires such qualification and each such jurisdiction is listed in <u>Section 4.1</u> of the Disclosure Schedule.

4.2.    <u>Authority</u>.

Subject to the entry of the final Sale Order to the extent applicable: (i) each Seller Party has all requisite power and authority and legal capacity to execute and deliver this Agreement and each other agreement, instrument, certificate or document required to be executed and delivered by such Seller Party pursuant hereto (collectively, the "<u>Seller Related Agreements</u>"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) the execution and delivery of this Agreement and the Seller Related Agreements to which it is a party by each Seller Party, the performance of this Agreement and the Seller Related Agreements by each Seller Party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of each Seller Party; (iii) this Agreement and each Seller Related Agreement to which it is a party have been duly executed and delivered by each Seller Party and constitute (or, in the case of any Seller Related Agreement executed after the Effective Date, will constitute) the valid and binding obligations of such Seller Party (assuming due authorization, execution and delivery by the other parties hereto and thereto), enforceable against each Seller Party in accordance with their respective terms, except as may be limited by an Enforcement Limitation.

4.3.    <u>No Conflicts; Consents</u>.

(a)    <u>No Conflicts</u>.    Subject to the entry of the final Sale Order, the execution and delivery of this Agreement and the Seller Related Agreements to which it is a party by each Seller Party do not, and the performance of this Agreement and the Seller Related Agreements to which it is a party by each Seller Party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Organizational Documents of such Seller Party, (ii) conflict with or violate any Law or Order applicable to such Seller Party or (iii) result in any material breach of, or constitute a material default (or an event that with notice or lapse of time or both would constitute a material default) under, or give rise to or create any right of any Third Party to accelerate, increase, terminate, modify or cancel any material right or material obligation in a manner adverse to the Business or result in the creation of any Lien, other than a Permitted Lien, on any of the Purchased Assets pursuant to, any Contracts to which any Seller Party is a party or by which any of the Purchased Assets is bound.

(b)    <u>Consents</u>.    Other than the final Sale Order, no Governmental Approval or other Consent is required to be obtained or made by Seller in connection with each Seller Party's execution and delivery of this Agreement and the Seller Related Agreements to which it is a party or the consummation or performance of the Transactions by each Seller Party, except (i) as set forth on <u>Section 4.3(b)</u> of the Disclosure Schedule or (ii) any Consent that, if not obtained, would not (A) materially and adversely affect the ability of Buyer to operate the Business

following the Closing as currently conducted by Seller or (B) cause a default under or breach of any Material Contract or Governmental Approval.

4.4.    Financial Statements.    Seller has delivered or made available to Buyer the following financial statements for the Seller (collectively, the "Financial Statements"):  (a) the unaudited balance sheets as of December 31 of the years 2018 and 2019; (b) the unaudited income statements for the fiscal years ended on December 31, 2018 and 2019; and (c) the unaudited balance sheet as of October 30, 2020 (the "Interim Balance Sheet Date"), and the related unaudited income statement for the five month period then ended (the statements in this clause (c) being the "Interim Financial Statements"). The Financial Statements have been prepared in accordance with GAAP (subject, in the case of the Interim Financial Statements, to the absence of notes and other presentation items and year-end adjustments, none of which shall be material) consistently applied and fairly present, in all material respects, the financial condition and results of operations of the Seller and the Business for each such period.

4.5.    Absence of Changes.    Since December 31, 2019, except for the Bankruptcy Case or as set forth on Section 4.5 of the Disclosure Schedule, (a) there has not been any Material Adverse Effect and (b) the Business has been operated in the Ordinary Course in all material respects.

Except as set forth on Section 4.5 of the Disclosure Schedule or as expressly contemplated by this Agreement, since December 31, 2019, Seller has not, with respect to the Business:

(a)    sold (other than in the Ordinary Course), abandoned, licensed, leased (as lessor or lessee), encumbered or caused to be encumbered or made any other disposition of any of its assets or properties relating to the Business (whether tangible or intangible);

(b)    except in the Ordinary Course or in amounts less than $25,000 either (i) individually or (ii) in a series of transactions with the same third party or its Affiliates, incurred or assumed, or agreed to incur or assume, any Liability;

(c)    except for equipment or inventory acquired in the Ordinary Course, made any acquisition of all or any part of the assets, properties, capital stock or business of any other Person or made any commitments to do any of the foregoing;

(d)    except in the Ordinary Course, hired, or agreed to hire, any Person to perform services in connection with the Business; entered into or amended any employment agreement of any employee of Seller (or amended, modified, terminated or released any non-compete, non-solicitation, confidentiality or other restrictive covenant or agreement) or any labor union, works council or association representing any employee; made any payment or commitment to pay severance or termination pay to any of its Representatives, consultants or independent contractors; established or increased any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, option (including the granting of stock options, profits interest, stock or membership appreciation rights, performance awards or restricted stock or membership awards), stock or membership purchase or other employee

- 18 -

benefit plan or arrangement, or otherwise increased the compensation payable to or to become payable to any Employee;

(e)        except in the Ordinary Course, terminated or agreed to terminate, or failed to renew, or received any written threat (that was not subsequently withdrawn) to terminate or fail to renew, any Contract that is or was material to the assets, properties, operations or condition (financial or otherwise) of the Business;

(f)        suffered or incurred any damage, destruction or loss (whether or not covered by insurance) materially adversely affecting the assets, properties, operations or condition (financial or otherwise) of the Business;

(g)        violated, breached or defaulted under in any material respect, or take or fail to take any action that would constitute a violation or breach of, or default under, any material term or material provision of any Contract to which Seller is a party pertaining to the Business or made any payment to, entered into or renewed any Contract or engaged in any transaction with, any Affiliate of Seller;

(h)        changed any of the accounting principles or practices used in the preparation of the Financial Statements, revalued in any material respect any of its assets, or changed its practices regarding collection or accrual of accounts receivable, reserves for uncollected accounts, inventory control, prepayment of expenses, payment of accounts payable, accrual of expenses, deferral of revenue or acceptance of customer deposits;

(i)        made or changed any Tax election or settled or compromised any Liability in respect of Taxes, changed in any respect any accounting method in respect of Taxes, filed any amendment to a Tax Return, entered into any closing agreement, settled any claim or assessment in respect of Taxes, or consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes;

(j)        planned, announced, implemented or effected any reduction in force, collective dismissal, mass termination, layoff, redundancy, plant or facility closing, early retirement program, or severance program concerning the termination of employment of its employees (other than routine employee terminations for cause under applicable Law);

(k)        voluntarily permitted any material insurance policy naming it as a beneficiary or a loss payable payee to be canceled or terminated; or

(l)        authorized, or committed or agreed to take, any of the foregoing actions.

4.6.    Material Contracts.

(a)        Section 4.6(a) of the Disclosure Schedule lists all of the following Contracts currently in effect to which Seller is a party (with respect to the Business) or by which any of the Purchased Assets is bound:

(i)        any Contract that in the most recent full fiscal year of Seller resulted in, or is reasonably expected by its terms in the future to result in, (A) the

- 19 –

payment by the Business of more than $50,000 per annum in the aggregate or (B) the receipt by the Business of more than $50,000 per annum in the aggregate;

(ii)    any Contract with any Person for employment by or the provision of management or consulting services to Seller;

(iii)    any Contract with a sales representative, advertising agency or other Person engaged in sales or promotional activities for Seller, or any Contract to act as one of the foregoing on behalf of any Person;

(iv)    any lease or sublease agreements under which Seller is the lessee or lessor of any tangible personal property (other than any such lease calling for payments of less than $50,000 per year);

(v)    any Contract pursuant to which Seller has made or will make material loans or advances, or has or will have incurred debts or become a guarantor or surety or pledged its credit on or otherwise become responsible with respect to any undertaking of another (except for the negotiation or collection of negotiable instruments in transactions in the Ordinary Course);

(vi)    any Contract providing for the creation of any Lien on the Purchased Assets (other than any Permitted Lien that is not required to be released at Closing);

(vii)    any power of attorney or agency agreement with any Person pursuant to which such Person is granted the authority to act for or on behalf of Seller with respect to the Business;

(viii)    any Contract that limits the freedom of the Business to compete in any line of business or with any Person or in any area and which would so limit the freedom of the Business after the Closing in any material respect;

(ix)    any joint venture or partnership Contract relating to the Business;

(x)    any Contract regarding the license, use, development, improvement, enhancement, escrow, modification, or the non-disclosure of any Intellectual Property (other than commercially available off-the-shelf software with aggregate annual license and/or maintenance fees of less than $5,000);

(xi)    any Contract with any Governmental Authority; and

(xii)    any other Contract not made in the Ordinary Course that is to be performed by Seller in whole or in part at or after the Effective Date (other than any Contract calling for payments by or to Seller of less than $50,000 per year).

(b)    True, correct and complete copies of all Contracts listed on <u>Section 4.6(a)</u> of the Disclosure Schedule (together with the Contracts listed in <u>Section 4.9</u> of the Disclosure Schedule, the Contracts listed in <u>Section 4.14(a)</u> of the Disclosure Schedule and the Real

- 20 -

Property Leases, the "Material Contracts"), together with all modifications, waivers and amendments thereto, have been made available to Buyer. Each of the Material Contracts is a valid and binding obligation of Seller and, to the Knowledge of Seller, the other parties thereto, enforceable in accordance with its terms and in full force and effect, except as may be limited by an Enforcement Limitation. There is not any existing material default or event of material default, or any event which, with or without notice or lapse of time or both, would constitute a material default under any Material Contract by Seller or, to the Knowledge of Seller, by any other party thereto. Seller has not received any written notice of the intention of any party to terminate any such Material Contract.

4.7.    Title to Purchased Assets; Sufficiency.

(a)    Seller has good and valid title to, or leasehold or license interest in, each of the Purchased Assets in each case free and clear of any Liens except for Permitted Liens or Liens which will be released at the Closing.

(b)    The Purchased Assets constitute all the assets, properties and rights of Seller necessary to operate the Business as currently being operated.

(c)    All of the tangible personal property included in the Purchased Assets, in each case with a value in excess of $10,000, is in good operating condition, ordinary wear and tear excepted.

4.8.    Real Property.    Seller does not and has not owned any real property. Section 4.8(a) of the Disclosure Schedule sets forth a correct and complete list of the address of all real property in which Seller has an interest pursuant to a real property lease, sub-lease or similar arrangement.

4.9.    Intellectual Property and Data Privacy.

(a)    Section 4.9(a) of the Disclosure Schedule lists, (i) with the application number, application date, registration/issue number, registration/issue date, title or mark, country or other jurisdiction and owner(s), as applicable, a complete and correct list of all Company Registered Intellectual Property, (ii) all Intellectual Property licensed by or to Seller (other than commercially available off-the-shelf software with aggregate annual license and/or maintenance fees of less than $5,000), and (iii) unregistered Marks owned or purportedly owned by Seller. All of the foregoing Company Registered Intellectual Property is valid, subsisting, and enforceable in accordance with applicable Law. All registrations for Company Owned Intellectual Property have been duly maintained and have not lapsed, expired or been abandoned. Seller has perfected title for and is the record owner of all Company Registered Intellectual Property with the appropriate Governmental Authority.

(b)    Except as listed in Section 4.9(b) of the Disclosure Schedule, Seller owns (free and clear of all Liens, other than any Permitted Lien), or has a valid and legally enforceable right to use without payment of any royalty, license fee or similar fee, the Intellectual Property used or held for use by Seller in the operation of the Business. Seller has sufficient Intellectual Property rights to operate the Business and those rights will be available for use by the Buyer

- 21 -

immediately after Closing.  No Person is licensed under any of the Company Owned Intellectual Property except as set forth in Section 4.6(a) of the Disclosure Schedule.

    (c)

        (i)    Seller has not received written notice that any such Company Owned Intellectual Property has been alleged unenforceable or otherwise invalid by any Person or declared unenforceable or otherwise invalid by any Governmental Authority.  The Company Owned Intellectual Property is not the subject of any Proceeding and, no Proceeding has been instituted, settled or threatened against Seller involving the Company Owned Intellectual Property, except for office actions by the applicable Governmental Authorities in the normal course of prosecution efforts to register the Company Registered Intellectual Property listed in Section 4.9(a).  To Seller's Knowledge, no such reason for invalidity or unenforceability of the Company Owned Intellectual Property exists.  Seller solely owns the entire right, title and interest in and to the Company Owned Intellectual Property, free and clear of all Liens.

        (ii)    Seller has not received any written charge, complaint, claim, demand or notice alleging that the conduct of the Business or any use, sale or offer to sell any good or service of Seller infringes upon, misappropriates, violates or otherwise conflicts with any Intellectual Property right of any other Person, including any claim that Seller must license or refrain from using any Intellectual Property right of any other Person or any offer or invitation by any other Person to license any Intellectual Property right of any other Person.  No Proceeding has been instituted, settled or threatened that alleges any such infringement, violation or misappropriation nor is Seller aware or should be aware of such Proceeding.

        (iii)    (A) The conduct of the Business of Seller has not and is not infringing upon, misappropriating or otherwise violating the Intellectual Property of any other Person, and (B) to Seller's Knowledge, no other Person has or is infringing upon, misappropriating or otherwise violating the Intellectual Property of Seller.  No Person, including past or present employees, officers, directors or shareholders of Seller, has any claim of ownership or rights in the Company Owned Intellectual Property.  All Employees, agents, consultants or contractors who have contributed to or participated in the creation or development of any of the Company Owned Intellectual Property (i) created such materials in the scope of his or her employment and (ii) is a party to a "work-for-hire" agreement under which Seller is deemed to be the original owner/author of all rights, title and interest therein and has executed an irrevocable assignment or an agreement to assign in favor of Seller of all right, title and interest in such Company Owned Intellectual Property.  Seller has provided the Buyer with true and complete copies of all such agreements.  All such agreements are valid, binding and enforceable between Seller and the other parties thereto.  Seller is not and no other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of breach or default of or any intention to terminate, any such agreements.

- 22 -

(d)     Except with respect to Seller's Knowledge, no representation or warranty is made in this Agreement regarding any infringement, misappropriation or violation with, upon, of, by or otherwise with respect to any (i) implied license of Intellectual Property or (ii) license for the non-exclusive use of any third party commercially available off-the-shelf software.

(e)     Seller has not used, copied, incorporated or otherwise exploited any Open Source Software in such a way that requires Seller to disclose, license or otherwise encumber any Company Owned Intellectual Property (other than such Open Source Software and direct modifications thereto) or that has caused or will cause Seller to grant to any third party any rights or immunities under any Company Owned Intellectual Property (other than with respect to such Open Source Software and direct modifications thereto).  To the Seller's Knowledge, there has been no unauthorized theft, reverse engineering, decompiling, disassembling, or other unauthorized disclosure of or access to the source code of Seller.  To the extent software has been developed by or on behalf of Seller for the conduct of the Business, Seller has sole possession all copies of its source code, documentation necessary to enable programmers and engineers to easily use, update and enhance such software by readily using the existing source code and documentation, and all information, tools, compilers, libraries needed to compile the source code, and all such materials will be available for use by the Buyer immediately after the Closing.

(f)     All of the Transferred Intellectual Property shall be owned or available for use by the Buyer immediately after the Closing Date on terms and conditions identical to those under which the Seller owned or used the Transferred Intellectual Property immediately prior to the Closing Date.

(g)     The computer systems, including the computer software, hardware, equipment, networks, databases, platforms, servers, interfaces, applications, websites and related information technology systems (collectively, the "Business Systems") (i) are owned, leased or licensed by Seller; (ii) are reasonably sufficient for the current needs of Seller to operate the Business including as to capacity, scalability, and ability to process current peak data needs and customer volumes in a timely manner; and (iii) such rights will be available for use by the Buyer immediately after the Closing.  In the last three year period ending on the date hereof, there have been no unauthorized access incidents, failures, breakdowns, data losses, security breaches, continued substandard performance or other adverse events affecting any such Business Systems that have caused disruption or interruption in or to the use of such Business Systems and/or the conduct of the Business.  The Business Systems do not contain any viruses or other software routines or hardware components designed to permit unauthorized access, to disable or erase software, hardware, or data.  Seller is not in breach of any of its contracts, agreements or licenses relating to the Business Systems.

(h)     Seller has taken commercially reasonable measures to protect the proprietary nature of the Transferred Intellectual Property and to maintain in confidence the trade secrets and confidential or proprietary information owned, held, and/or used by it in connection with the conduct of the Business. All Employees, contractors, and other Persons with access to Seller's confidential information have executed enforceable written agreements requiring them to maintain the confidentiality of such information, use such information only for the benefit of Seller, and assign all rights in such information and other Intellectual Property to the Seller.

- 23 –

Seller maintains commercially reasonable security, disaster recovery, back-up, and Business continuity plans, procedures and facilities and test such plans and procedures on a regular basis, and such plans and procedures have been updated where proven ineffective in any material respects following such testing.

(i)    Seller is in compliance in all material respects with (i) all Data Protection Laws, (ii) Seller's written privacy policies and public written statements regarding the Seller's privacy or data security practices, (iii) all provisions of contracts to which the Seller is a party or is otherwise bound that relate to the processing of Personal Information, and (iv) to the extent applicable to the Seller, the Payment Card Industry Data Security Standard (collectively, "Privacy and Security Requirements"). The Seller maintains reasonable physical, technical, and administrative security measures and policies designed to protect all Personal Information owned, stored, used, maintained, or processed by the Seller from and against unlawful, accidental or unauthorized access, destruction, loss, use, modification and/or disclosure. There has been no occurrence of any (x) unlawful, accidental, or unauthorized destruction, loss, use, modification or disclosure of or access to Personal Information owned, stored, used, maintained, or processed by the Seller or a third party on behalf of the Seller where the Seller was required by applicable Data Protection Laws to notify government authorities, affected individuals, or other third parties of such occurrence, or (y) unauthorized access to or disclosure of the Seller's confidential information or trade secrets that reasonably would be expected to result in a Material Adverse Effect. Seller has not received any written notice of any proceeding, investigation, or claim against the Seller alleging that any processing of Personal Information by the Seller violates any applicable Data Protection Law and, to the Seller's Knowledge, there are no facts or circumstances that are likely to form the basis for any such proceeding, investigation or claim. The sale and transfer to Buyer of any Personal Information included in the Purchased Assets does not violate any applicable Privacy and Security Requirement.

4.10.    Litigation.    Except as set forth in Section 4.10 of the Disclosure Schedule, (a) there is no material Proceeding pending or, to Seller's Knowledge, threatened against Seller (with respect to the Business), involving the Purchased Assets or relating to the Business or the Transactions and (b) Seller (with respect to the Business) is not party to, nor is the Business or any of the Purchased Assets the subject of, any Order.

4.11.    Compliance with Laws; Governmental Approvals; Anti-Corruption.

(a)    Seller is and has been since January 1, 2018 in compliance in all material respects with applicable Law.  No written notice has been received by Seller from January 1, 2018 to the Effective Date from any Governmental Authority alleging that Seller is not or was not in compliance in any material respect with any applicable Law relating to the Businesses or the Purchased Assets that has not been remedied.

(b)    Seller possesses all material Governmental Approvals required by applicable Law necessary for the operation of the Business in the Ordinary Course, all of which are in full force and effect and set forth in Section 4.11(b) of the Disclosure Schedule.  Seller and its Affiliates are, and since January 1, 2018 have been, in substantial compliance with the terms and requirements of the respective Governmental Approvals identified in Section 4.11(b) of the Disclosure Schedule.  Since January 1, 2018 to the Effective Date, Seller and its Affiliates have

not received any written notice or other written communication from any Governmental Authority regarding (a) any actual or possible violation of or failure to comply with any term or requirement of any Governmental Approval identified in Section 4.11(b) of the Disclosure Schedule or (b) any actual or possible revocation, withdrawal, suspension or modification of any such Governmental Approvals.

(c)     No act or transaction has been effected by or on behalf of Seller (with respect to the Business) that has involved a violation of any Anti-Corruption Law.

(d)     Since the onset of the COVID-19 Pandemic, Seller has complied, in all material respects, with all Laws relating to COVID-19, including those relating to (i) shelter-in-place and quarantine orders, (ii) the maintenance of safe and acceptable working conditions, including by making disclosures regarding positive cases of COVID-19 among employees or service providers of Seller, (iii) employee benefits, privacy or labor and employment, including with respect to the furlough or termination of employees or the reduction or modification of compensation or employee benefits, if any, and (iv) the Families First Act and the CARES Act.

4.12.   Employee Matters.

(a)     Seller has complied since January 1, 2018 in all material respects with all applicable Laws pertaining to employment and employment practices in the operation of the Business.  All individuals treated by Seller as independent contractors or employees have been properly so characterized for purposes of all applicable Laws. Except for the Pending Litigation, there are no Proceedings against Seller pending, or to Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or other Person in connection with the employment of any Employee or former employee of Seller or in connection with any current or former consultant or independent contractor of Seller, including any claim, complaint or grievance relating to unfair labor practices, employment classification, employment discrimination, harassment, retaliation, equal pay, immigration, occupational health and safety, paid sick or other leave, wages and hours or any other employment-related matter arising under applicable Laws.

(b)     Seller is not a party to or bound by any collective bargaining or similar agreement with any labor organization, or work rules or practices agreed to with any labor organization or employee association and there is no pending or, to Seller's Knowledge, threatened organizational campaign or petition seeking recognition of a collective bargaining agent for any Employee.  There is no unfair labor practice charge or complaint against Seller pending or, to Seller's Knowledge, threatened before the National Labor Relations Board or any comparable state, local or foreign agency, and there is no labor strike, dispute, slowdown, stoppage or lockout actually pending or, to Seller's Knowledge, threatened against or directly affecting Seller, and since January 1, 2018 there has not been any such action.

(c)     To Seller's Knowledge, no Person that is performing services for Seller has been in violation in any material respect of any employment contract, non-disclosure agreement, noncompetition agreement or restrictive covenant to a former employer relating to the right of any such Person to be employed or retained by Seller because of the nature of the business conducted by Seller.  To Seller's Knowledge, except as asserted in the Pending

- 25 –

Litigation, no Person who is or who has performed services for Seller is or has been since January 1, 2018 in violation in any material respect of any employment contract, non-disclosure agreement, noncompetition agreement or restrictive covenant in respect of an agreement or contract between Seller and such Person.

(d)   Each Employee in the United States is: (i) a United States citizen; (ii) a lawful permanent resident of the United States; or (iii) an alien authorized to work in the United States specifically for Seller.   Seller has completed a Form I-9 (Employment Eligibility Verification) or submitted the applicable information through the U.S. Citizenship and Immigration Services' E-Verify system for each Employee in the United States and each such Form I-9, as applicable, has since been updated as required by applicable law and such form and original documents relating to employment eligibility and authorization is correct and complete in all material respects as of the date hereof.

4.13.   Employee Benefit Matters.

(a)   Section 4.13(a) of the Disclosure Schedule sets forth a list of: (i) each Benefit Plan that is sponsored, maintained or otherwise contributed to, or required to be sponsored, maintained or contributed to, by or on behalf of Seller with respect to the Employees or any other Person ("Seller Benefit Plans"); and (ii) each employment, management consulting or other agreement pertaining to the performance of services for or on behalf of Seller (whether written or oral), which is not terminable by Seller at will.

(b)   Seller has furnished, or made available to Buyer:  (i) all current Seller Benefit Plan documents and any amendments thereto; (ii) summary plan descriptions for each Seller Benefit Plan for which a summary plan description is required; and (iii) for each Seller Benefit Plan intended to be qualified under Section 401(a) of the Code, the most recent determination letter received from the Internal Revenue Service or, in the case of a prototype plan, the most recent opinion letter with respect to such qualified Seller Benefit Plan, or in the case of a specimen plan, the most recent advisory letter with respect to such qualified Seller Benefit Plan.

(c)   The establishment, maintenance and operation of all Seller Benefit Plans has complied in all material respects, in form and operation, with the terms of all applicable plan documents and with the terms of ERISA, the Code and other applicable Law.

(d)   Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service (or is entitled to rely upon a favorable opinion letter issued by the Internal Revenue Service) and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification.

(e)   There are no pending or, to Seller's Knowledge, threatened Proceedings or claims against Seller involving any Seller Benefit Plan.

(f)   Neither the execution of this Agreement nor the consummation of the Transactions shall alone or in combination with another event: (i) entitle any current or former

employee of Seller to material severance pay, unemployment compensation or any other payment; (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation or benefits due, or result in any other material obligations to, any current or former employee of Seller or other Person; or (iii) result in payments that would not be deductible under Section 280G of the Code.

(g)    No Benefit Plan is, and neither Seller nor its ERISA Affiliates have ever maintained, established, sponsored, participated in, had any liability with respect to, contributed to, or been required to contribute to any: (i) employee benefit plan subject to Title IV or Section 302 of ERISA or to the funding requirements of Section 412 or 430 of the Code(ii) "multiemployer plan" (as defined in Section 3(37) of ERISA) or with respect to any employee benefit plan of the type described in Section 4063 or 4064 of ERISA or in Section 413(c) of the Code, (iii) "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA) or "multiple employer plan" subject to Section 413(c) of the Code, or (iv) employee benefit plan providing post-employment or post-retirement health or welfare benefits to any current or former director, officer, employee or independent contractor (or the dependents or beneficiaries thereof) other than health continuation coverage pursuant to Part 6 of Subtitle B of Title I of ERISA or as otherwise required by Law at the participant's sole expense.

(h)    Section 4.13(g) of the Disclosure Schedule sets forth a true, correct and complete list of all agreements (written or oral) included in the Assumed Contracts providing for a "deferral of compensation" as defined under Section 409A of the Code (and any regulations or other guidance issued by the Internal Revenue Service with respect to Section 409A of the Code) to an Employee of Seller or any other Person providing services to Seller (or would provide for "deferral of compensation" except that the agreement incorporates a substantial risk of forfeiture). All such agreements have in form and operation complied with the requirements of Section 409A(a)(2), (3) and (4) of the Code (and any regulations or other guidance issued by the Internal Revenue Service with respect to Section 409A of the Code).

4.14.    Taxes. Seller has filed or caused to be filed on a timely basis all Tax Returns that are or were required to be filed by or on behalf of Seller, and all such Tax Returns were true, correct and complete in all material respects. Except as set forth in Schedule 4.14, Seller has properly paid (or caused to be paid) all material Taxes owed by Seller (whether or not shown on any Tax Return). All Taxes that Seller is or was required by applicable Law to withhold, deduct or collect have been duly withheld, deducted and collected by Seller and, to the extent required, have been paid to the proper Governmental Authority. No claim has been made in writing by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by such jurisdiction. Seller has never been a member of an affiliated, consolidated, unitary or combined group filing a consolidated, unitary or combined Tax Return. Seller has no liability for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract, or otherwise. Seller is not a party to or bound by any Tax allocation or sharing agreement (other than customary agreements for which Taxes are not the principal subject matter).

- 27 -

4.15.   Brokers.  No investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of Seller or Member, and no such Person is entitled to any fee or commission from Buyer or any of its Affiliates in connection with the Transactions.

4.16.   Material Relationships.  None of Seller's ten largest customers or suppliers during the one-year period immediately prior to the Effective Date has notified Seller in writing of an intention to terminate or materially adversely change its existing business relationship with Seller and Seller has no reason to believe that such termination or alteration of the relationship with Seller is likely to occur.  To the Knowledge of Seller, no such supplier or customer is threatened with bankruptcy or insolvency.

4.17.   Undisclosed Liabilities.  Seller has no direct or indirect Indebtedness or other material Liability with respect to the Business, which are not adequately reflected or reserved against in the Financial Statements, except (a) those arising since the date of the Interim Financial Statements in the Ordinary Course, (b) those incurred in connection with the Transactions; or (c) that would not, individually or in the aggregate, materially impair the ownership or use of the Purchased Assets related to the operation of the Business as currently conducted.

4.18.   Accounts Receivable.   All accounts receivable of Seller included in the Closing Accounts Receivable Schedule have arisen from bona fide transactions in the Ordinary Course, are enforceable and represent valid obligations to Seller.  There is no contest, claim or right of set-off relating to the amount or validity of any such accounts receivable.  Collection of the accounts receivable of Seller through the date hereof has been and is consistent with the past business practices of Seller.  Seller has no reason to believe that the collection of accounts receivable following the Closing will be materially different from the historical experience for the Business.

4.19.   Disclaimer.  EXCEPT AS SET FORTH IN THIS ARTICLE IV (AS MODIFIED BY THE DISCLOSURE SCHEDULE), NONE OF THE SELLER PARTIES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS OR REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF SELLER OR THE BUSINESS. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  Nothing set forth herein shall limit or inhibit any claims or remedies by Buyer or any Buyer Indemnified Party against the Seller Parties for fraud or intentional misrepresentation by any Seller Party or their Representatives in connection with the Transactions.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants as follows:

5.1.   Organization and Good Standing.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, with all requisite power and

– 28 –

authority to conduct its business as now conducted and to own and lease its properties and assets. Buyer is duly qualified or licensed to do business and is in good standing in each other jurisdiction in which the failure to be so duly qualified or registered would reasonably be expected to have a Material Adverse Effect.

5.2.   Authority.  Buyer has all requisite power and authority to execute and deliver this Agreement and each other agreement, instrument, certificate or document required to be executed and delivered by Buyer pursuant hereto (collectively, the "Buyer Related Agreements"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Buyer Related Agreements by Buyer, the performance of this Agreement and the Buyer Related Agreements by Buyer, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Buyer.  This Agreement and each Buyer Related Agreement have been duly executed and delivered by Buyer and constitute (or, in the case of any Buyer Related Agreement executed after the Effective Date, will constitute) the valid and binding obligations of Buyer (assuming due authorization, execution and delivery by the other parties hereto and thereto), enforceable against Buyer in accordance with their respective terms, except as may be limited by an Enforcement Limitation.

5.3.   No Conflicts; Consents.

(a)   The execution and delivery of this Agreement and the Buyer Related Agreements by Buyer do not, and the performance of this Agreement and the Buyer Related Agreements by Buyer and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Organizational Documents of Buyer, (ii) conflict with or violate any Law or Order applicable to Buyer or by or to which any of its properties or assets is bound or subject or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give rise to or create any right of any Person to accelerate, increase, terminate, modify or cancel any material right or material obligation under, any Contracts to which Buyer is a party or by which any of its properties or assets is bound, except where such a breach, violation, default, conflict or right will not materially and adversely affect Buyer's ability to consummate the Transactions.

(b)   No Governmental Approval or other Consent is required to be obtained or made by Buyer in connection with Buyer's execution and delivery of this Agreement and the Buyer Related Agreements or the consummation or performance of the transactions contemplated thereby by Buyer, except any Consent that will not materially and adversely affect Buyer's ability to consummate the Transactions.

5.4.   Litigation.  There is no Proceeding pending or, to Buyer's knowledge, threatened against or affecting Buyer relating to the Transactions or that could materially and adversely affect Buyer's ability to consummate the Transactions.

5.5.   Availability of Funds.  Buyer will have available cash at Closing, sufficient to enable Buyer to consummate the Transactions to be effectuated at the Closing.  Buyer's obligations hereunder are not contingent upon procuring any financing.

– 29 –

5.6.    Brokers.  No investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of Buyer, and no such Person is entitled to any fee or commission from Seller or any of its Affiliates in connection with the Transactions.

## ARTICLE VI
### COVENANTS

6.1.    Conduct of Business.

(a)    During the period from the Effective Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall (a) maintain the Purchased Assets and conduct the Business in all material respects in the Ordinary Course, (b) maintain the assets and properties of the Business, (c) preserve intact the Business and the current relationships and goodwill of the Business with employees (except in the case of termination for cause), customers and suppliers, (d) maintain the Books and Records in the usual, regular and ordinary manner, on a basis consistent with the Ordinary Course, and (e) comply in all material respects with applicable Law, except (i) as may be required by applicable Law or (ii) with the prior written consent of Buyer (which shall be in its sole discretion).

(b)    In addition to and without limiting the generality of Section 6.1(a), during the period from the date hereof until the earlier of the termination of this Agreement in accordance with its terms and the Closing Date, except (i) as may be required by applicable Law or (ii) with the prior written consent of Buyer (which shall be in Buyer's sole discretion) Seller and Member shall not take any action described in Section 4.5 of this Agreement or take any of the following actions:

(i)    amend Seller's Organizational Documents in a manner adverse to Buyer;

(ii)    grant any Person any right to acquire any of its equity interests;

(iii)    except in connection with the Filing or the Bankruptcy Case and the Transactions, adopt a plan of complete or partial liquidation, dissolution, merger, consolidation or other reorganization;

(iv)    subject any of the Purchased Assets to any Lien, except for Permitted Liens and Liens that will be discharged as of the Closing Date;

(v)    divest, sell, assign, license, transfer, abandon, cancel, convey, lease or otherwise dispose of, whether or not for value, any assets, rights or properties that would constitute Purchased Assets;

(vi)    engage in (A) any activity with the effect of accelerating to pre-Closing periods sales to the trade or otherwise that would otherwise be expected (based on past practice) to occur in post-Closing periods, (C) accelerating collections of any Accounts Receivable, (D) postponing payments by Seller that

would otherwise be expected (based on past practice) to be made in pre-Closing periods, or (E) any other deferred revenue activity;

(vii)   make any material change in the manner of billing of, or the extension of credit to, any customers of the Business;

(viii)   disclose, dispose of, cancel or permit to expire, terminate or otherwise lapse any rights in, to or for the use of any of the Transferred Intellectual Property or grant any license, covenant not to sue or other right under any of the Transferred Intellectual Property;

(ix)   increase the compensation (including severance, change-in-control and retention compensation) or benefits of any Employee, except (A) as required by applicable Law, or (B) increases in compensation in the Ordinary Course;

(x)   hire any individual employee or modify, terminate or release any non-disclosure, confidentiality, non-disparagement, non-compete, or non-solicitation agreements or similar restrictive covenant;

(xi)   do any other act which would cause any representation or warranty of Seller or Member in this Agreement, or in any Ancillary Document, to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect at such time;

(xii)   enter into any new line of business;

(xiii)   fail to maintain adequate levels of working capital consistent with past practice; or

(xiv)   authorize, agree or resolve or consent to do any of the foregoing.

6.2.   Pre-Closing Access.

(a)   For purposes of furthering the transactions contemplated hereby, Seller shall afford Buyer and its Representatives reasonable access during normal business hours upon reasonable advance notice to Sellers, throughout the period from the Effective Date until the earlier of the termination of this Agreement and the Closing, to Seller's personnel, properties, contracts, commitments, Books and Records and such other information concerning such entities' respective business, properties and personnel of the Business as Buyer may reasonably request. All access pursuant to this Section 6.2(a) shall be (i) conducted in such a manner as not to interfere unreasonably with the normal operations of Seller and (ii) coordinated exclusively through the designated Representatives of Seller. For the avoidance of doubt, Buyer shall not contact any customers, suppliers, employees, contractors or landlords of Seller without Seller's prior written consent, which shall not be unreasonably withheld.

(b)   Notwithstanding anything to the contrary contained in this Section 6.2(b), Seller shall not be required to provide any access, or make available any document,

- 31 –

correspondence or information, if doing so would, in the reasonable judgment of Seller's legal counsel, (i) jeopardize the attorney-client privilege of Seller or (ii) conflict with any (A) Law applicable to a Seller or the assets or operation of the Business or (B) Contract to which Seller is a party or by which any of Seller's assets or properties are bound; provided that in such instances, Seller shall inform Buyer of the general nature of the information being withheld and, upon Buyer's request, reasonably cooperate with the other party to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (i) and (ii).

(c)    The Parties hereto hereby agree until the Closing occurs, that all information provided to them or their respective Representatives in connection with this Agreement and the consummation of the transactions contemplated hereby shall be governed in accordance with the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms.

(d)    In order to facilitate Seller's efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of one (1) year following the Closing, Buyer shall permit Seller and Seller's counsel, accountants and other Representatives (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other Books and Records which comprised part of the Purchased Assets (prior to the Closing Date) that are required to complete the Post-Close Filings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (B) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and applicable Permitted Access Party reimburses Buyer for the reasonable costs and expenses thereof; provided, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of any of Buyer's business after the Closing Date.  Notwithstanding anything contained in this Section 6.2(d) to the contrary, in no event shall Sellers have access to any information that, based on advice of Buyer's counsel, could reasonably be expected to (i) create liability under applicable Law, or waive any legal privilege, (ii) result in the discharge of any trade secrets of Buyer, its affiliates or any third parties, (iii) violate any obligation of Buyer with respect to confidentiality or (iv) relate to the post-Closing operations of the Business or use of the Purchased Assets.

6.3.    Post-Closing Access and Information.

(a)    Throughout the three-year period after Closing, subject to the reasonable confidentiality precautions of the party whose information is being accessed, each of Buyer and Seller will, during normal business hours and upon reasonable notice from any requesting party, at such requesting party's expense: (i) cause such requesting party and such requesting party's Representatives to have reasonable access to the Business Pre-Closing Books and Records held by such party, to the extent reasonably necessary to: (A) defend or pursue any Proceeding; (B) defend or pursue indemnification matters hereunder; (C) prepare or audit financial statements; (D) prepare or file Tax Returns; or (E) address Tax, accounting, financial or legal matters or respond to any investigation, audit or other inquiry by or under the control of any Governmental

Authority; and (ii) permit such requesting party and such requesting party's Representatives to make copies of such Business Pre-Closing Books and Records for the foregoing purposes. If requested by a party relating to the ownership and conduct of the Business prior to the Closing Date (the "Business Pre-Closing Books and Records"), such requesting party will provide reasonable substantiation of such requesting party's purpose for such access to show that such access is for any of the foregoing purposes.

(b)    Post-Closing Information Retention.    At and after Closing, Seller may retain copies of Books and Records for the Purchased Assets or the Business that are in Seller's possession or control (or the possession or control of any of its Affiliates), in each case for any purpose described in Section 6.3(a)(i). All such Books and Records shall be subject to the provisions of Section 6.13(e).

6.4.    Confidentiality; Publicity.

(a)    The terms of the Confidentiality Agreement shall terminate at the Closing.

(b)    Except as stated in this Section 6.4(b), each party will not, and each party will cause each of its Affiliates not to, make any public release or announcement regarding this Agreement or any of the Transactions without the prior written approval thereof of each other party (which, after Closing, will not be unreasonably withheld, conditioned or delayed). Buyer and Seller will cooperate with each other in issuing, promptly after Closing, a joint press release that announces the parties' entry into this Agreement and the Transactions generally.

(c)    Notwithstanding the foregoing, nothing in this Section 6.4 will prevent any of the following at any time:

(i)    a party or any of its Affiliates disclosing any information to the extent required under applicable Law or under the rules and regulations of any national securities exchange (to the extent such party or any of its Affiliates has any of its securities traded or listed thereon);

(ii)    Seller informing other potential acquirers of the Business that a definitive agreement has been entered into, without identifying Buyer or any of its Affiliates;

(iii)    Seller communicating with any customers of the Business on a need to know basis regarding the Transactions;

(iv)    a party communicating to its direct or indirect stockholders, members or partners (as applicable);

(v)    a party or any of its Affiliates making a statement or disclosure (A) as part of its or any of its Affiliate's financial statements or Tax Returns or (B) to the extent reasonably necessary to enforce or comply with this Agreement; or

(vi)    a party making a statement or disclosure to (A) such party's (or any of its Affiliate's) legal, accounting and financial advisers to the extent

- 33 -

reasonably necessary for any such adviser to perform its legal, accounting and financial services, respectively, for such party (or such Affiliate) or (B) any lender or prospective lender of such party (or such Affiliate) to the extent reasonably required as part of such lending relationship; provided, however, that such party will cause each Person to whom such statement or disclosure is made under this clause (vi) to keep confidential and not disclose to any other Person any information in such statement or disclosure.

6.5.    Bulk Transfer Laws.    Buyer hereby waives compliance by Seller and its Affiliates, as applicable, with the provisions of any so-called "bulk transfer law," "bulk sales law" or any similar laws of any jurisdiction in connection with the sale of the Purchased Assets to Buyer and Seller and Member agree that all Liabilities associated therewith shall be Excluded Liabilities.

6.6.    Employment Matters.

(a)    Employment.    Effective as of the Closing, Buyer shall offer employment to such employees of the Business as of the Closing Date ("Employees") as Buyer determines in its sole discretion, upon such terms and conditions as Buyer may elect in its sole discretion. Each Employee accepting such an offer of employment from Buyer is referred to herein as a "Transferred Employee".

(b)    Cooperation.    Seller shall cooperate with Buyer and its representatives and agents in connection with any employment offers to Employees, including affording Buyer reasonable opportunities to review employment records to the extent not prohibited by applicable Law, to discuss terms and conditions of employment with any or all of the Employees and to distribute to any or all of the Employees forms and documents relating to employment with Buyer. Except as prohibited by applicable Law, after the Closing, Seller shall promptly deliver to Buyer electronic copies of all personnel files and records (including medical records and payroll records, if any) related to the Transferred Employees.

(c)    Seller Benefit Plans.    Except as otherwise provided under the terms of any Seller Benefit Plan, or as otherwise specified in this Agreement, the Transferred Employees shall cease, effective as of the Closing, any active participation in (including eligibility to contribute to) and any benefit accrual under the Seller Benefit Plans and Seller shall retain any liability or obligation with respect to benefits accrued or claims incurred by Transferred Employees on or prior to the Closing Date.

(d)    WARN Act Liabilities.    Buyer shall be responsible for any WARN Act or similar applicable state Law notices or liabilities arising from or resulting from the termination by Buyer of any Transferred Employees.

(e)    Third Party Beneficiaries.    Nothing in this Section 6.6 shall create any third party beneficiary right in any Person (other than the parties to this Agreement), including any Transferred Employee, any participant in any Benefit Plan, or any dependent or beneficiary thereof, or any right to continued employment with the Buyer, Seller or any of their Affiliates.

- 34 -

6.7.    <u>Tax Matters</u>.

(a)    <u>Transfer Taxes</u>.  Seller and Buyer shall cooperate in timely making all filings, returns, reports and forms as may be required in connection with transfer, sales, use, value added, registration, excise and other similar taxes, fees and duties imposed on the purchase and sale of the Purchased Assets ("<u>Transfer Taxes</u>").  Seller and Buyer, as appropriate, shall execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements relating to any such Transfer Taxes.  Seller and Member shall be responsible for the timely payment of all Transfer Taxes.  Upon written notice (together with supporting documentation) from Buyer as to the amount of any Transfer Taxes paid by Buyer and Seller shall reimburse Buyer with respect to such Transfer Taxes within three Business Days after receipt of such notice.  Each party shall use, and shall cause each of its Affiliates to use, reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes, including pursuant to section 1146(a) of the Bankruptcy Code as applicable, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemption.  Seller shall, upon request, provide Buyer with documentation that may be necessary to show that such Transfer Taxes were paid.

(b)    <u>Cooperation</u>.  Each party will, and each party will cause its applicable Affiliates to, cooperate in all reasonable respects with respect to Tax matters and provide one another with such information as is reasonably requested to enable the requesting party to complete and file all Tax Returns it may be required to file (or cause to be filed) with respect to the Business, to respond to Tax audits, inquiries or other Tax Proceedings and to otherwise satisfy Tax requirements.

6.8.    <u>Post-Closing Deliveries</u>.  After Closing, each party will promptly deliver to the proper party any mail or other communications, monies, checks or other instruments of payment received by such party that belong to such other party or to which such other party is entitled.

6.9.    <u>Further Assurances</u>.  Following the Closing, if any further action is necessary, proper or desirable to carry out any purpose of this Agreement, then each party will take such further action (including the execution and delivery of further documents) as any other party reasonably requests to carry out such purpose.  The foregoing will be at the expense of such requesting party, except to the extent such requesting party is entitled to indemnification therefor or to the extent this Agreement otherwise allocates such expense to any other party.

6.10.    <u>Expenses</u>.  Except as otherwise provided herein, each party shall pay all of its own fees, costs and expenses incurred in connection with this Agreement and the Transactions, including the fees and disbursements of counsel, financial advisors, investment bankers, consultants, brokers and accountants, whether or not the Closing occurs.

6.11.    <u>No Affiliation</u>.  As of the Closing, Buyer shall not and shall cause each of its Affiliates to not hold itself out as having any affiliation with Seller or any of its Affiliates.

6.12.    <u>Contact with Persons Regarding the Business</u>.  Until the Closing Date, none of Buyer, its Affiliates and their Representatives shall contact or communicate with the customers, licensors and landlords of the Business in connection with the Transactions or the operation of

- 35 –

the Business without the prior written consent of Seller, and any such contacts or communications to which consent is granted shall be coordinated with the Member. For clarity, Buyer, its Affiliates and their Representatives shall not be precluded from contacting or communicating with any Person in the Ordinary Course for any purpose unrelated to the Business and the Transactions.

6.13.   Restrictive Covenants of the Seller Parties.

(a)   Acknowledgement.  Each Seller Party acknowledges that (i) Buyer would not have entered into this Agreement but for the agreements and covenants contained in this Section 6.13; and (ii) the agreements and covenants contained in this Section 6.13 are essential to protect the Business and its goodwill and are reasonable and appropriate in scope.

(b)   Non-Compete.  To induce Buyer to enter into this Agreement, each Seller Party covenants and agrees that during the Restricted Period, the Restricted Parties shall not, directly or indirectly, (A) engage in any business or activity that competes with the Business as conducted as of the Closing Date; (B) render any services to any Person for use in competing with Buyer in connection with the Business as conducted as of the Closing Date; or (C) have an interest in any Person engaged in any business that competes with Buyer in connection with the Business as conducted as of the Closing Date, directly or indirectly, in any capacity, including as a partner, member, stockholder, lender, officer, director, manager, principal, agent, trustee or consultant or any other relationship or capacity; provided, however, any Restricted Party may own, directly or indirectly, solely as a passive investment, not more than 2% of any class of securities of any Person which are publicly traded.

(c)   Employees of the Business.  During the Restricted Period, each Restricted Party shall not, directly or indirectly, (i) solicit or encourage any employee or consultant performing services in connection with the Business to leave the employment or retention of Buyer or any of its Affiliates, or (ii) hire any such employee or consultant who was performing services in connection with the Business and who has left the employment or retention of Buyer or any of its Affiliates within one (1) year of the termination of such employee's employment or consultant's retention with Buyer or any of its Affiliates.

(d)   Customers of the Business.  During the Restricted Period, each Restricted Party shall not, directly or indirectly, (i) persuade or attempt to persuade any customer, prospective customer, or supplier of the Business not to hire or do business with Buyer or any of its Affiliates or any successor thereto; or (ii) solicit for himself or any Person other than Buyer or any of its Affiliates, the business of any Person who is a customer of the Business as of the Closing Date, or was its customer within two years prior to the Closing Date, to the extent that such business is similar to the business conducted by such customer with the Business.

(e)   Confidential Information.  Following the Closing, each Restricted Party shall keep secret and retain in strictest confidence, and shall not use for the benefit of such Restricted Party or others, all confidential or proprietary matters relating to the Business or Buyer and its Affiliates, including, but not limited to, "know how", trade secrets, customer lists, supplier lists, Intellectual Property, details of consultant and employment contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or

- 36 –

plans, business acquisition plans, technical processes, designs and design projects, processes, inventions, software, source codes, object codes, programmer materials, systems documentation and research projects and other business affairs ("Confidential Information"), and shall not disclose them to any Person outside of Buyer and its Affiliates provided, however, this covenant shall not apply to any information which is or becomes generally available to the public other than as a result of disclosure by a Restricted Party. A Restricted Party may disclose Confidential Information if required to do so in any legally required government or securities filings, legal proceedings, subpoena, civil investigative demand or other similar process; provided, that such Restricted Party (i) provides Buyer with prompt notice of such required disclosure so that Buyer may attempt to obtain a protective order, (ii) cooperates with Buyer, at Buyer's expense, in obtaining such protective order, and (iii) only discloses that Confidential Information which is required to be disclosed as advised by counsel.

(f)     Non-Disparagement. Each Restricted Party shall not, directly or indirectly disparage the Business, Buyer or Buyer's Affiliates, stockholders, directors, officers, employees or agents. Buyer shall not, and shall cause its Affiliates to not, directly or indirectly, disparage the Restricted Parties or the Restricted Parties' stockholders, directors, officers, employees or agents.

(g)     Rights and Remedies Upon Breach. If any Restricted Party breaches any of the provisions of this Section 6.13, Buyer shall have the right and remedy to have the restrictive covenants set forth in this Section 6.13 specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause immediate and irreparable injury to Buyer and that money damages alone may not provide adequate remedy to Buyer, and such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to Buyer under law or in equity.

(h)     Blue Penciling. If any term or other provision of this Section 6.13 is determined to be invalid, illegal, or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Section 6.13 shall nevertheless remain in full force and effect. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to, or the court making such a determination shall, modify this Section 6.13 so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

6.14.    Change and Use of Seller Name. Within thirty (30) days following the Closing, Seller shall cause to be filed a proper certificate of amendment of its certificate of formation, and shall execute such documents and all other papers and perform such further acts as may be reasonably required or desirable to effect the change of Seller's name in each jurisdiction in which it does business to a name that does not include the words "AppealTech" or any variations thereof or any terms confusingly similar thereto. In addition, Seller shall notify Buyer in advance of any such filings, and shall provide any necessary consents or approvals to allow Buyer to reserve or otherwise use such name. Seller and Member each covenant and agree on behalf of itself and its Affiliates for perpetuity that they shall not, in the United States or any foreign country, directly or indirectly utilize the name "AppealTech" or any derivations thereof,

- 37 -

whether as an entity name or for marketing, branding or other commercial purposes, or any terms confusingly similar thereto.

6.15    Correspondence; Payments

(a)    Seller authorizes Buyer on and after the Closing Date to receive and open all mail and other communications received by Buyer relating to the Purchased Assets and to deal with the contents of such communications in good faith and in a proper manner. Seller shall promptly deliver, or cause to be delivered, to Buyer any mail or other communications received by Seller or its Affiliates from (x) any Governmental Authority, customer, or supplier intended for the Buyer (including any mail or other communications in respect of the Purchased Assets, the subject matter of this Agreement and the Ancillary Agreements) within two (2) Business Days following receipt thereof, and (y) any other Person intended for the Buyer (including any mail or other communications in respect of the Purchased Assets, the subject matter of this Agreement and the Ancillary Agreements) within five (5) Business Days following receipt thereof.

(b)    Seller agrees that Buyer has the right and authority to endorse, without recourse, any check or other evidence of indebtedness received by Buyer in respect of any note or account receivable transferred to Buyer pursuant to this Agreement and Seller shall furnish Buyer such evidence of this authority as Buyer may request.

6.15.    Bankruptcy Court Approval.

(a)    Seller Parties and Buyer acknowledge that this Agreement, the Ancillary Documents and the sale of the Purchased Assets are subject to Bankruptcy Court approval.

(b)    As soon as reasonably possible but in any event no later than two (2) Business Days after the Parties execute this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court, together with required supporting papers and required notices.

6.16.    Bankruptcy Court Filings and Procedures.

(a)    Seller shall pursue the entry of the Sale Order pursuant to the Sale Motion, and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated hereby. Seller shall comply (or obtain an order or orders from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code in connection with obtaining entry of the Sale Order. Seller shall consult with Buyer and its Representatives concerning the Sale Order and any other orders of the Bankruptcy Court relating to the transactions contemplated hereby, and all Proceedings in connection therewith, and provide Buyer with drafts of all applications, pleadings, notices, proposed orders and other documents relating to Proceedings relating to the transactions contemplated hereby, as soon as reasonably practicable, and consider and incorporate any reasonable comments of Buyer in connection with any such applications, pleadings, notices, proposed orders and other documents.

(b)    Without limiting the generality of the foregoing, no later than two (2) Business Days after the execution and delivery of this Agreement, Seller shall file the Sale

Motion with the Bankruptcy Court, and shall use its commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order as promptly as possible (and in any event within twenty-four (24) calendar days thereafter).

(c)     Seller shall give all notices required by applicable Law to all Persons entitled thereto, of all motions (including the motion seeking entry of the Sale Order), orders, hearings, and other Proceedings relating to this Agreement and the transactions contemplated hereby, and such additional notices as may be ordered by the Bankruptcy Court or as the Buyer may reasonably request. Seller shall promptly provide Buyer with copies of all communications from the Bankruptcy Court or third parties relating to any motions seeking entry of the Sale Order.

(d)     The Sale Order will provide, among other things, that pursuant to Sections 105, 363 and 365 of the Bankruptcy Code:

(i)     the Purchased Assets shall be sold and transferred to Buyer, free and clear of all Liens pursuant to this Agreement;

(ii)     on or before the Closing Date and in accordance with Section 1.5, all Cure Amounts shall be paid to the appropriate parties as ordered by the Bankruptcy Court;

(iii)     Buyer shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code;

(iv)     Buyer shall have no liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, and, for the avoidance of doubt, Buyer shall have no successor liability under any collective bargaining agreement, contract with any union or under any pension plan or other Seller Benefit Plan under which Seller or any Affiliate thereof is or was an obligor or a party;

(v)     the Sale Order is effective immediately upon entry and not stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and

(vi)     Buyer shall have no Liability for any Excluded Liabilities or Excluded Assets.

(e)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Buyer thereof and shall provide Buyer with a copy of the related notice of appeal or order of stay. Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request at their own cost and expense and obtain an expedited resolution thereof.

- 39 -

(f)      Seller agrees that the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other Governmental Authority for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement or the Sale Order, or in any way prevent or interfere with the consummation or performance of the transactions contemplated hereby.

(g)      <u>Private Sale</u>.  Seller represents that the Purchase Price is sufficient to satisfy all claims against the Seller, and in consideration thereof, agrees that it shall move for Bankruptcy Court approval of this Agreement and the transactions contemplated herein without seeking other offers, bids or proposals, and shall not request any auction.

## ARTICLE VII
### CONDITIONS PRECEDENT

7.1.    <u>Conditions to Obligations of Each Party</u>.   The obligations of the parties to consummate the Transactions shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(a)      <u>No Orders</u>.   No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise prohibiting the consummation of such Transactions.

(b)      <u>No Proceedings</u>. No Proceeding shall have been commenced for the purpose of enjoining, restraining or otherwise preventing the consummation of the Transactions.

(c)      <u>Sale Order</u>.  The Sale Order shall be in effect and not subject to any appeal or stay.

7.2.    <u>Conditions to Obligations of Buyer</u>.   The obligations of Buyer to effect the Closing shall be subject to the fulfillment (or waiver by Buyer) on or prior to the Closing Date of the following conditions:

(a)      <u>Representations and Warranties</u>.   The representations and warranties of Seller contained in this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect) shall be true and correct on and as of the Closing Date as if made on and as of such date (other than representations and warranties that address matters only as of a certain date, which shall be true and correct as of such date), except for any inaccuracy in any representation or warranty that, individually or in the aggregate with any other such inaccuracy, has not had a Material Adverse Effect.

(b)      <u>Covenants</u>.   Seller shall have performed in all material respects the covenants and agreements contained in this Agreement required to be performed by Seller on or prior to the Closing Date.

– 40 –

(c)     Seller Related Agreements.  Buyer shall have received the Seller Related Agreements, dated as of the Closing Date, duly executed by Seller and all other parties thereto.

(d)     Escrow Agreement.  Each of Seller and the Escrow Agent shall have executed and delivered the Escrow Agreement, subject to such changes as are reasonably acceptable to Buyer.

(e)     Other Closing Deliveries.  Seller shall have delivered (or caused to be delivered) to Buyer each of the other items contemplated to be so delivered by Seller under this Agreement, including each item listed in Section 3.2(b).

(f)     Buyer Approval of Disclosure Schedule.  Buyer shall have reviewed and approved the Disclosure Schedule in its sole discretion, and any modifications or revisions thereto as requested by Buyer shall have been implemented in form and substance satisfactory to Buyer.  Seller acknowledges and agrees that the inclusion of the Disclosure Schedule in this Agreement shall not constitute Buyer's approval of or consent to such Disclosure Schedule, and Buyer preserves all rights to review such Disclosure Schedule.

7.3.    Conditions to Obligations of Seller.  The obligation of Seller to effect the Closing shall be subject to the fulfillment (or waiver by Seller), on or prior to the Closing Date, of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality) shall be true and correct on and as of the Closing Date as if made on and as of such date (other than representations and warranties that address matters only as of a certain date, which shall be true and correct as of such date), except for any inaccuracy in any representation or warranty that, individually or in the aggregate with any other such inaccuracy, has not had a material and adverse effect on Buyer and does not materially and adversely affect Buyer's ability to consummate the Transactions.

(b)     Covenants.  Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date.

(c)     Buyer Related Agreements.  Seller shall have received the Buyer Related Agreements, dated as of the Closing Date, duly executed by Buyer and all other parties thereto.

(d)     Escrow Agreement.  Each of Buyer and the Escrow Agent shall have executed and delivered the Escrow Agreement, subject to such changes as are reasonably acceptable to Seller.

(e)     Other Closing Deliveries.  Buyer shall have delivered (or caused to be delivered) to Seller each of the other items contemplated to be so delivered by Buyer under this Agreement, including each item listed in Section 3.2(a).

- 41 -

7.4.    Frustration of Closing Conditions.  Neither Seller, on the one hand, nor Buyer, on the other hand, may rely, either as a basis for not consummating the Closing or terminating this Agreement, on the failure of any condition set forth in Sections 7.1,  7.2 or 7.3, as the case may be, to be satisfied if such failure was caused by such party's breach of any provision of this Agreement or failure to use its reasonable efforts to consummate the Transactions, as required by and subject to Section 6.2.

## ARTICLE VIII
### TERMINATION

8.1.    Termination.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing, as follows:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by either Seller or Buyer, if the Closing shall not have been consummated on or prior to 5:00 p.m. New York City Time, on January 25, 2021 (the "End Date"); provided that, if as of the End Date any of the conditions set forth in Section 7.1(a), Section 7.1(b) or Section 7.1(c) shall not have been satisfied or waived, the End Date may be extended on one occasion by Buyer in its discretion for a period of up to thirty (30) Business Days by written notice to the Seller Parties, and such date, as so extended, shall be the End Date; provided further, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to Seller, if the failure of the transactions contemplated hereby to be consummated by such date shall be due to any Seller Party causing a material breach of any covenant or other agreement of any Seller Party set forth in this Agreement, and shall not be available to Buyer, if the failure of the transactions contemplated hereby to be consummated by such date shall be due to Buyer causing a material breach of any covenant or other agreement of Buyer set forth in this Agreement;

(c)    by either Seller or Buyer, if an Order by a Governmental Authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided, that the right to terminate this Agreement pursuant to this Section 8.1(c) shall not be available to Seller if such Order resulted from, or could have been avoided but for, the material breach by any Seller of any covenant or other agreement of such Seller set forth in this Agreement, and shall not be available to Buyer if such Order resulted from, or could have been avoided but for, the material breach by Buyer of any covenant or other agreement of Buyer set forth in this Agreement;

(d)    by Seller if Buyer shall have breached or there is any inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any of its covenants or other agreements contained in this Agreement, which breach, inaccuracy or failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in Section 7.3(a) or Section 7.3(b) and (ii) is either not curable or is not cured by the earlier of (A) the End Date and (B) the date that is thirty (30) calendar days following written notice from Seller to Buyer of such breach, inaccuracy or failure; provided, that Seller

- 42 –

may not terminate this Agreement pursuant to this <u>Section 8.1(d)</u> if any Seller Party is in material breach or violation of its representations, warranties or covenants contained in this Agreement;

   (e) by Buyer, if any Seller Party shall have breached or there is any inaccuracy in any of their representations or warranties, or shall have breached or failed to perform any of their covenants or other agreements contained in this Agreement, which breach, inaccuracy or failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in <u>Section 7.2(a)</u>, or <u>Section 7.2(b)</u> and (ii) is either not curable or is not cured by the earlier of (A) the End Date and (B) the date that is thirty (30) calendar days following written notice from Buyer to Seller of such breach, inaccuracy or failure; <u>provided</u>, that Buyer may not terminate this Agreement pursuant to this <u>Section 8.1(e)</u> if Buyer is in material breach or violation of its representations, warranties or covenants contained in this Agreement;

   (f) by Buyer, if the Sale Order has not been entered by the Bankruptcy Court on or prior to the date that is sixty (60) calendar days after the execution and delivery of this Agreement;

   (g) by Buyer, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code for any reason, or if the Bankruptcy Court appoints a Chapter 11 trustee; or

   (h) by Buyer, if Seller (or a permitted third party) files a proposed plan of reorganization or liquidation in the Chapter 11 case which does not provide for the consummation of the transactions with Buyer as set forth herein.

  8.2. <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall terminate (except that the Confidentiality Agreement, this <u>Section 8.2</u> and <u>ARTICLE IX</u> shall survive any termination), and there shall be no other Liability on the part of any Party; provided that nothing herein shall relieve any Party from Liability for fraud, willful misconduct or a willful breach of its covenants or agreements set forth in this Agreement prior to such termination. In the event of termination of this Agreement, and regardless of the reason for the termination, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms and any such termination shall not amend, modify, release, waive or otherwise limit any rights or obligations under the Confidentiality Agreement.

## ARTICLE IX
### INDEMNIFICATION

  9.1. <u>Indemnification by Seller Parties</u>.  Subject to the requirements set forth in this <u>Article IX</u>, the Seller Parties shall jointly and severally indemnify and hold harmless Buyer and its Affiliates (and the officers, directors, equity holders, employees and agents of each of them) (collectively, the "<u>Buyer Indemnified Parties</u>" and individually, a "<u>Buyer Indemnified Party</u>") from and against any and all Losses arising, directly or indirectly, from or in connection with any:

(a)     breach of any representation or warranty made by any Seller Party in this Agreement or in any Closing Instrument;

(b)     breach or non-fulfillment of any covenant or other agreement made or to be performed by any Seller Party in this Agreement or in any Closing Instrument; or

(c)     Liability of any Seller Party, including any Excluded Liability.

9.2.    Indemnification by Buyer.  Subject to the requirements set forth in this Article IX, Buyer shall indemnify and hold harmless the Seller Parties and their Affiliates (and the officers, directors, equity holders, employees and agents of each of them) (collectively, the "Seller Indemnified Parties" and individually, a "Seller Indemnified Party") from and against any and all Losses arising, directly or indirectly, from or in connection with any:

(a)     breach of any representation or warranty made by Buyer in this Agreement or in any Closing Instrument; or

(b)     breach or non-fulfillment of any covenant or other agreement made or to be performed by Buyer in this Agreement or in any Closing Instrument.

9.3.    Limitations.  Notwithstanding anything herein to the contrary:

(a)     A party otherwise liable for indemnification under this Article IX (an "Indemnifying Party") shall have no liability for an indemnification claim under Section 9.1(a) or 9.2(a) unless such Indemnifying Party shall have received a Claim Notice with respect thereto on or before the eighteen-month anniversary of the Closing Date (the "Termination Date") provided that (x) claims for breach of any Core Representation, fraud or intentional misrepresentation shall survive indefinitely and (y) claims for breach of any covenant or agreement hereunder shall survive until expiration of the applicable statute of limitations.

(b)     No indemnification shall be payable under this Article IX for a Limited Indemnification Claim with respect to any such Loss that together with any related Losses does not exceed $5,000.  Any Loss that exceeds this threshold shall be referred to herein as a "Covered Loss."

(c)     The Seller Parties shall have no liability for Limited Indemnification Claims unless the aggregate amount of Covered Losses for such claims exceeds $50,000 (the "Basket"), after which the Seller Parties shall be liable for Losses in excess of the Basket (subject to the other limitations herein).  The Seller Parties shall have no liability under this Article IX for Limited Indemnification Claims, in the aggregate, in excess of the Escrow Amount (the "Cap"), and the aggregate liability of the Seller Parties for indemnification under this Article IX shall not exceed the Purchase Price except with respect to indemnification pursuant to Sections 9.1(b) and (c).

(d)     Buyer shall have no liability for Limited Indemnification Claims unless the aggregate amount of Covered Losses for such claims exceeds the Basket, after which Buyer shall be liable for Losses in excess of the Basket (subject to the other limitations herein). Buyer

- 44 –

shall have no liability under this Article IX for Limited Indemnification Claims, in the aggregate, in excess of the Cap, and the aggregate liability of Buyer for indemnification under this Article IX shall not exceed the Purchase Price.

(e)    The amount of any and all Losses payable under this Article IX shall appropriately take into account Tax consequences and shall be determined net of any insurance proceeds and any indemnity, contribution or other similar payment actually received by the Indemnified Party with respect to such Losses (net of any costs to obtain such recovery and any premium increases).    For purposes of determining whether a breach of a representation, warranty, covenant or agreement has occurred or computing any Losses under this Article IX with respect to any representation, warranty, covenant or agreement that is qualified as to materiality by use of the terms "in all material respects," or words of substantially equivalent meaning, such qualification or limitation shall be disregarded.

(f)    Each party will mitigate each Loss for which such party is or may become entitled to be indemnified hereunder to the extent required by applicable Law.

(g)    No Indemnifying Party shall have any indemnification obligations for punitive damages.

(h)    From and after the Closing, the indemnification rights provided by this Article IX shall constitute the sole and exclusive remedy of the Indemnified Parties for any breach of representations, warranties, covenants or agreements contained in this Agreement or in any Closing Instrument; provided, however, that nothing herein shall limit (i) any claim based on fraud or intentional misrepresentation, or (ii) any party's right to seek specific performance, injunctive relief or other equitable remedies.    In furtherance of the foregoing, to the maximum extent permitted by applicable Law, each party hereby waives and (if necessary to give effect to this Section 9.3(h)) will cause each of its Affiliates and each of its and its Affiliates' officers, directors, equity holders, employees and agents to waive, all claims, causes of action and other remedies with respect to such party against each other as a matter of Contract, equity, under or based upon any applicable Law or otherwise (including for rescission), except to the extent expressly stated in this Article IX.

9.4.    Escrow.  To secure the indemnification obligations of the Seller Parties under this Agreement, the Escrow Amount will be deposited into the Escrow Account pursuant to Section 3.3(a) and the terms of the Escrow Agreement.    Any amounts owed to any Buyer Indemnified Party from the Seller Parties under this Agreement shall be paid first, from the Escrow Account, and second, in the event the funds in the Escrow Account are not sufficient, from the Seller Parties, subject to the limitations set forth in this Article IX and the terms of the Escrow Agreement. Disbursements from the Escrow Account shall be made in accordance with the terms of this Agreement and the Escrow Agreement.  Promptly following the Termination Date, the Escrow Agent shall disburse the amounts remaining in the Escrow Account, subject to this Article IX and the terms of the Escrow Agreement, to Seller.  Any fees incurred in the establishment, maintenance or termination of the Escrow Account shall be paid in equal shares by Buyer and Seller.

9.5.   <u>Indemnification Claims</u>.   Any claim for indemnification under this <u>Article IX</u> shall be brought and asserted by Buyer or Seller (on behalf of all affected Indemnified Parties) by delivering written notice of such claim to the Indemnifying Party (and, if applicable, the Escrow Agent) (the "<u>Claim Notice</u>").  The Claim Notice shall set forth, in reasonable detail, the facts and circumstances giving rise to such claim and the amount of Losses actually incurred and, to the extent the Losses have not yet been incurred, a good faith, non-binding estimate of the amount of Losses that are reasonably expected to be incurred to the extent such an estimate can be reasonably determined.

9.6.   <u>Third-Party Claims</u>.   In the event that an Indemnified Party receives written notice of the commencement of any Third Party claim or Proceeding or of the imposition of any penalty or assessment, for which indemnity may be sought pursuant to this <u>Article IX</u> (a "<u>Third-Party Claim</u>"), and the Indemnified Party intends to seek indemnity pursuant to this <u>Article IX</u>, the Indemnified Party shall promptly provide the Indemnifying Party (and, if applicable, the Escrow Agent) with notice of such claim, Proceeding, penalty or assessment, to which the complaint or other papers commencing such Third-Party Claim shall be attached.  In the event of failure to give such notice, the Indemnified Party's entitlement to indemnification hereunder in respect of such Third-Party Claim shall not be adversely affected except to the extent, if any, that the Indemnifying Party is prejudiced thereby.  The Indemnifying Party shall have the right, but not the obligation, to control the defense of such Third-Party Claim, including the right to settle such Third-Party Claim (provided that if the proposed settlement provides for relief other than the payment of money damages by the Indemnifying Party, the Indemnifying Party may settle such Third-Party Claim only with the consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed), if the Indemnifying Party gives notice of the intention to do so to the Indemnified Party within thirty (30) days (or such lesser number of days as may be required by any court proceeding) after the Indemnifying Party receives notice of such claim, subject to the limitations below, and shall have the right to select and retain legal counsel, which counsel shall be reasonably satisfactory to the Indemnified Party, to defend or settle any claim or demand subject to this Section, provided that the Indemnified Party shall have the right to retain its own counsel, at its sole expense, to monitor the defense or settlement of any claim or demand.  If the Indemnifying Party assumes the defense of a claim or demand, such assumption will establish for purposes of this Agreement that the claims made such claim or demand are within the scope of and subject to indemnification; provided, however, that if the Indemnifying Party is unable to determine whether or not it disputes its indemnification obligations within the time period described above, then the Indemnifying Party and the Indemnified Party shall jointly defend such claim until such time as the Indemnifying Party determines whether or not it disputes its indemnification obligations; provided that during such period the Indemnifying Party and the Indemnified Party shall each bear its own costs and expenses in the defense of such Third Party Claim; provided, further, that any reasonable out of pocket costs and expenses incurred by the Indemnified Party shall be deemed indemnifiable Losses to the extent that such claim is determined to be indemnifiable by the Indemnifying Party (in proportion to the amount of the Third Party Claim that the Indemnifying Party is responsible for).  The Indemnified Party shall cooperate with the Indemnifying Party and its counsel in contesting any Third-Party Claim, including in making any counterclaim against the Person asserting the Third-Party Claim, or any cross complaint against any Person (other than the Indemnifying Party or any of its Affiliates). The Indemnified Party may, at its sole cost and expense, retain separate counsel to participate in,

but not control, any defense or settlement of any Third-Party Claim.  In the event that (i) the Indemnifying Party fails or elects not to assume the defense of the claim in accordance with this Section, or the Indemnifying Party fails to diligently pursue the defense of such assumed claim or demand in the Indemnified Party's reasonable judgment, (ii) an Indemnified Party determines in good faith that there is a reasonable possibility that an adverse determination with respect to the proceeding giving rise to such claim for indemnification would be materially detrimental to the Indemnified Party's current business or future business prospects, other than as a result of money damages, (iii) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegation, investigation or any other matter involving a Governmental Authority; or (iv) under applicable standards of professional conduct, a conflict of interest on any significant issue related to such proceeding exists between the Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, then in each case the Indemnified Party shall conduct or re-assume the defense of and shall have the right to settle any such claim (and the costs and expenses incurred by the Indemnified Party in connection with such defense or settlement shall be included in the Loss for which the Indemnified Party may seek indemnification pursuant to a claim made hereunder).  The Indemnifying Party shall have the right to receive copies of all pleadings, notices and communications with respect to such claim and shall have the right to retain its own counsel, at its sole expense, to monitor the defense or settlement of any claim or demand.

Notwithstanding anything in this Section 9.6 to the contrary, should any Third Party Claim hereunder involve a situation where the Indemnified Party reasonably anticipates that a significant part of the claim will be borne by it, the parties shall act reasonably and shall jointly consult, prosecute and defend any such Third Party Claim.  In such circumstances each party shall bear the aggregate expenses of such Third Party Claim in proportion to the amount of the Third Party Claim for which it is responsible.

9.7.    Adjustment to Purchase Price.  Any amounts paid pursuant to this Article IX shall be considered an adjustment to the Adjusted Purchase Price for Tax purposes to the extent allowed under applicable Law.  Buyer and Seller, and each of their respective Affiliates, shall prepare and file, and cause their Affiliates to prepare and file, Tax Returns consistent with the treatment described in the foregoing sentence.

## ARTICLE X
### MISCELLANEOUS

10.1.    Severability.  If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Agreement, or remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the Transactions are consummated to the fullest extent possible.

- 47 -

10.2.    Notices.  All communications, notices and consents provided for herein shall be in writing and be given in person, by overnight courier or by mail, and shall become effective:  (a) on delivery if given in person; (b) one Business Day after delivery to the overnight courier; or (c) four Business Days after being mailed, with proper postage and documentation, for first-class registered or certified mail, prepaid.  Notices shall be addressed as follows:

    (A)    if to Buyer to,

        Counsel Press Inc.
        460 West 34th Street
        12th Floor
        New York, NY 10018
        Attention:  Scott Thompson,
        Chief Executive Officer

        and to:

        Counsel Press Inc.
        c/o Gladstone Investment Corporation
        1521 Westbranch Drive
        Suite 100
        McLean, VA 22102
        Attention: Portfolio Management
        Fax: (703) 287-5801

        with a copy to:

        Blank Rome LLP
        1825 Eye Street, N.W.
        Washington, D.C. 20006-5403
        Attention: Emanuel Faust, Jr.
        Fax: (202) 379-9293

    (B)    if to Seller to,

        Z&J LLC
        7 West 36th Street
        12th Floor
        New York, NY 10018
        Attention: Michael Kestan

        with a copy to:

        Mazzola Lindstrom LLP
        1350 Avenue of the Americas

- 48 –

2nd Floor
New York, NY 10019
Attention: Greg Gilliam

or, in each case, at such other address as may be specified in writing to the other parties hereto.

10.3.   Entire Agreement.   This Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, the Closing deliveries, and the other instruments and agreements expressly contemplated by this Agreement collectively constitute the entire agreement among the parties and supersede any prior understanding, agreements or representations by or among the parties, including the Confidentiality Agreement, written or oral, to the extent they relate in any way to the subject matter hereof.

10.4.   Counterparts.   This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  Delivery of an executed counterpart of this Agreement by facsimile or electronic transmission shall be effective to the fullest extent permitted by applicable Law.

10.5.   Specific Performance.   The parties acknowledge that, in view of the uniqueness of the Business and the Transactions, each party would not have an adequate remedy at Law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that the other party shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled at Law or in equity. Each of Buyer and Seller hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by the other party and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of each party under this Agreement.  Any party seeking an injunction or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such injunction or Order.

10.6.   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.

(a)     This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by the laws of the State of New York, without giving effect to any choice or conflict of laws, provisions or rules that would cause the application of laws of any jurisdiction other than the State of New York.

(b)     All Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in

- 49 -

any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 10.2) or any other manner permitted by law.

(c)     TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS.

10.7.   Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

10.8.   Assignment.  No assignment shall be made by any party without the prior written consent of the other party hereto provided that Buyer may assign its rights hereunder as collateral to any Lender.  Subject to the foregoing, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

10.9.   No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their respective Affiliates and permitted assigns, and the Indemnified Parties, and nothing herein, express or implied, shall give or be construed to give to any other Person any legal or equitable rights hereunder.

10.10.  Amendment; Waivers, etc.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto and in compliance with applicable Law.  Except as expressly set forth in this Agreement, no failure on the part of any party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.  No party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

10.11. <u>Disclosure Schedule</u>.   The Disclosure Schedule is organized in sections that correspond to the sections of this Agreement.  Each disclosure in the Disclosure Schedule shall be in reference exclusively to (i) the corresponding section of this Agreement and (ii) any other section of this Agreement but only if the relevance of the disclosure to the other section would be reasonably apparent on the face of such disclosure to a reasonable person who has no knowledge of the disclosed subject matter.  A disclosure in the Disclosure Schedule shall not constitute an admission that the matter disclosed is material for purposes of this Agreement or an admission of any sort for any purpose other than this Agreement.  Capitalized terms used in the Disclosure Schedule but not defined therein shall have the meanings ascribed to them in this Agreement.

*[Remainder of Page Intentionally Blank;
Signatures to Follow]*

- 51 –

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

"Buyer"

Counsel Press Inc.

By: _____
     Name: Scott Thompson
     Title:   CEO & President

"Seller"

Z & J LLC

By *Michael Kestan* _____
     Name: Michael Kestan
     Title:

"Member"

*Michael Kestan* _____
Michael Kestan

*[Signature page to AppealTech Asset Purchase Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

"Buyer"

Counsel Press Inc.

By: _Scott Thompson_____
     Name: Scott Thompson
     Title:  CEO & President

"Seller"

Z & J LLC

By: _____
     Name: Michael Kestan
     Title:

"Member"

_____
Michael Kestan

*[Signature page to AppealTech Asset Purchase Agreement]*